DeWitt and Ella McDONALD,
Plaintiffs-Appellants,

v.

Raymond L. and Bonnie G. VERBLE et
al., Defendants-Appellees.

No. 78–3127.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 13, 1980.

Decided May 5, 1980.

C. Thomas McCarter, Toledo, Ohio, Alexander M. Spater, Columbus, Ohio, Green, Lackey, Newcomer & Harris, Toledo, Ohio, Alexander M. Spater, Spater, Gittes, Marshall & Terzian, Columbus, Ohio, for plaintiffs-appellants.

Leonard J. Catri, Catri, Howells, Kellam & Owens, Sandusky, Ohio, for Verbles.

Ronald G. Kaufman, Rhode, Kaufman & Egger Co., LPA, Sandusky, Ohio, for Sandusky Real Estate and Holderness.

Before EDWARDS, Chief Judge, LIVELY, Circuit Judge and PHILLIPS, Senior Circuit Judge.

EDWARDS, Chief Judge.

The question in this case is whether the Federal Civil Rights and Fair Housing laws, 42 U.S.C. § 1982 (1976) and 42 U.S.C. § 3601 *et seq.* (1976) require owners and realtors engaged in selling housing to avoid both blatant and subtle racial discrimination in their sales efforts. It is clear to this court that the practices found by the District Judge in his careful findings of fact could be said not to have done egregious damage to the plaintiffs. This is particularly true since in the end they did succeed in purchasing the property at issue at a price comparable to that at which it had been offered previously to a prospective white buyer.

The District Judge did not disregard the nondiscrimination requirements of the statute and the Constitution. On the contrary,

it was the District Judge's timely issuance of a Temporary Restraining Order which accomplished the sale. This record contains the District Judge's findings of fact which we print nearly in their entirety. These detail with sensitivity the discriminatory variations from the prohibition on racial discrimination which we find in the law. The parties to this appeal do not dispute these findings. It is their legal effect which is at issue.

■ We believe, however, that the prohibition on racial discrimination contained in the applicable statutes (and underlying constitutional principles) is absolute. We hold that contrary to the judgment entered by the District Court dismissing plaintiffs' complaint with costs to the defendants, this case must be remanded to the District Judge after vacation of the judgment for the consideration of damages and the award to plaintiffs of costs and attorneys' fees.

We have italicized the specific findings which we hold demonstrate statutory and constitutional violations.

### Findings of Fact

1) Plaintiffs, DeWitt and Ella McDonald, husband and wife, are black citizens of the United States who have been residents of Sandusky, Ohio, for the past seventeen (17) years.

2) Defendants, Raymond L. and Bonnie G. Verble, are white citizens of the United States who presently live in Tennessee, and who in July of 1975 resided in Castalia, Ohio, and were the owners of the property located at 2131, 2135, 2137 and 2139 Parkview-McArthur Park, Sandusky, Ohio (hereinafter McArthur Park property). The McArthur Park property is a four-unit rental complex with each comprised of a two-bedroom apartment. The Verbles owned said property, which is located in an area occupied predominantly by white families, for approximately ten years prior to 1975.

3) Defendant, Sandusky Real Estate One, Inc., is a real estate brokerage firm doing business in Sandusky, Ohio.

4) Defendant, Ralph G. Holderness, is a real estate agent licensed by the State of Ohio, who is employed as general manager of Sandusky Real Estate One, Inc.

5) In early July, 1975, the Verbles began efforts to sell the McArthur Park property by advertising the property in the Sandusky Register.

6) On or about July 3, 1975, in response to an ad placed by Defendant Verbles in the July 1, 1975 Sandusky Register, Ella McDonald called the Verbles and inquired as to the property, including the purchase price. *Ella McDonald was informed that the purchase price was $26,500,* and an appointment was made for the McDonalds to see the property on the day of her initial inquiry concerning the McArthur Park property.

7) That evening the McDonalds met Raymond Verble at the McArthur Park property and observed the exterior of the residence and the inside of two apartments. At this time DeWitt McDonald indicated to Raymond Verble that he was interested in purchasing the property. Mr. Verble told Mr. McDonald to call him at home later on that evening to discuss the matter further. Mr. Verble indicated that he did not wish to discuss the matter in the presence of another gentleman who was with him at that time. Mr. Verble said that he would be going out of town for approximately a week.

8) Later that evening DeWitt McDonald called the Verble residence and was informed by Bonnie Verble that her husband was not home yet. Mr. McDonald informed her that he had called pursuant to her husband's request, that he was interested in buying the McArthur Park property, and that he wanted to talk to Mr. Verble before Mr. Verble left town. *Mr. McDonald did not receive a return phone call from the Verbles.*

9) On Sunday, July 6, 1975, Ella McDonald called the Verble residence to inquire as to the status of the property and was informed by Raymond Verble that two men were going to purchase the property. Ella McDonald informed Mr. Verble that they were interested in purchasing the

property and requested Mr. Verble to call them if the two men he referred to were not able to secure financing. *The plaintiffs did not hear again from the Verbles.*

10) *The McDonalds observed that the newspaper advertisement for the sale of the McArthur Park property continued to appear in the Sandusky Register on Tuesday, July 8 and Wednesday, July 9, 1975.* Thereafter, Plaintiff DeWitt McDonald contacted Gerry Owens, who is a white resident of Castalia, Ohio, and who has been a friend of DeWitt McDonald's for a considerable time. The purpose of Mr. McDonald's contact with Gerry Owens was to seek his assistance in purchasing the McArthur Park property and to ascertain whether or not the Verbles were discriminating against him in the purchase of the property on account of his race or color. Mr. McDonald asked Mr. Owens to call the owners of the property and to make an appointment to see the McArthur Park property and to submit an offer to purchase for said premises.

11) Defendant Ralph Holderness contacted the Verbles on July 15, 1975, after seeing their ad in the Sandusky Register, to determine if the Verbles would list their property with Real Estate One. A Listing Agreement was signed by the Verbles on that date. The Listing Agreement gave Real Estate One the exclusive right to sell the property for Twenty Nine Thousand Five Hundred (29,500) Dollars, with a ten percent (10%) commission to the real estate broker. At the time the Listing Agreement was executed, Mr. Verble told Mr. Holderness that the "Hurak brothers" had indicated an interest in the property. Accordingly, Mr. Holderness agreed that the Huraks would be excluded from the Listing Agreement until August 1, 1975, and that if the property was sold to the Huraks on or before August 1, 1975, Mr. Holderness would not receive a commission.

*The Verbles did not tell Mr. Holderness that they had talked with Mr. McDonald or that Mr. McDonald was interested in the McArthur Park property.*

12) *During the conversation between Mr. Verble and Mr. Holderness on July 15th regarding the Listing Agreement, Mr. Verble told Mr. Holderness that he preferred not to sell the property to blacks.* Mr. Holderness then told Mr. Verble that he would have to show the property to any interested purchaser, and that he would have to sell to a black if a black offered $29,500, or made the highest offer. Mr. Holderness testified that Mr. Verble agreed to these conditions when he entered into the Listing Agreement.

13) During the conversation between Mr. Verble and Mr. Holderness on July 15th regarding the Listing Agreement, Gerry Owens called the Verble residence and inquired whether the property was still for sale. Mr. Verble indicated that it was, and Mr. Owens then said that he wanted to see the property. Mr. Verble told him that he would call him to set up an appointment. Mr. Verble then gave Mr. Owens' name and number to Mr. Holderness, and Mr. Holderness called Mr. Owens the next day to set up an appointment.

14) Thereafter, Mr. Owens went to the office of Real Estate One and was shown the property owned by the Verbles on Parkview Drive by a sales associate of Mr. Holderness. Mr. Holderness called Mr. Owens the following day to see whether Mr. Owens was interested in purchasing the property. Mr. Owens then contacted Mr. McDonald, who advised him to stall, as he was going on vacation. . . .

15) Mr. Holderness testified that his usual practice was to get as much money for the seller of the property as possible; that if there were two offers on the property, one of which was lower than the other, he would try to get the offeror who had submitted the lower bid to submit a higher offer. He also testified that if a prospective purchaser submitted an offer, he would tell other persons who were interested in the property that an offer had been submitted; he would take down their phone number; and he would call them if the prior offer fell through.

16) Mr. Holderness testified that if a customer inquired about property in a particu-

lar section of Sandusky, he would try to give the customer as many listings in that area as he could. . . .

17) On July 24, 1975, DeWitt McDonald went to the offices of Real Estate One to inquire about the status of the McArthur Park property. He met with Defendant Holderness. Mr. McDonald told Mr. Holderness that he was interested in purchasing some investment property. According to the testimony of Mr. McDonald, *Mr. Holderness informed Mr. McDonald of a number of properties which were suitable for purchase for investment reasons, but he did not mention the McArthur Park property.* Plaintiff McDonald inquired a number of times whether there was any property for sale in McArthur Park. *Defendant Holderness initially insisted that there was not.* After persistent inquiries by the plaintiff, *Defendant Holderness informed him that there was a piece of property for sale* in the McArthur Park area, but the property was *located on Forest Drive.* Mr. McDonald then specifically asked Defendant Holderness if there was any property for sale on the Parkview Drive part of McArthur Park. *After Defendant Holderness had several times denied that such property was for sale, he finally indicated that the McArthur Park property was for sale, but that he was interested in purchasing the property for himself.* Mr. Holderness testified at trial that he had considered purchasing the McArthur Park property, but upon inquiry learned that financing was not available.

18) After Mr. Holderness indicated that the McArthur Park property was for sale, Mr. McDonald told him that he wanted to purchase the property. Mr. Holderness asked him whether he wished to view the premises and the method of financing that he would use to buy the property. Mr. McDonald informed Mr. Holderness that he did not need to see the property; that if it was good enough for Mr. Holderness, it was good enough for him. He instructed Mr. Holderness to prepare an offer to purchase.

19) Mr. Holderness informed Plaintiff DeWitt McDonald that the purchase price was $29,500. Mr. McDonald, in a written offer to purchase dated July 24, 1975, offered to purchase the McArthur Park property for $26,500. Both plaintiffs signed the offer to purchase. They also deposited a check for $50 as earnest money with Mr. Holderness. The McDonald's offer to purchase was to remain in effect until July 28, 1975.

20) There are several disputes in the testimony as to what transpired between Mr. Holderness and Gerry Owens after DeWitt McDonald executed his offer to purchase on July 24, 1975.

Owens testified that Holderness called him and told him that the owners had a buyer, but that the owners did not want to sell to that party, and that the owners might take less than the list price. Owens further testified that after Holderness' call he talked to DeWitt McDonald, who told him to offer $25,500 for the property. Owens testified that he then went into Holderness' office for the purpose of making an offer of $25,500, but that Holderness told him he could not take an offer for $25,500. *Owens testified that Holderness told him the Verbles might take an offer of $27,500 because they had just refused an offer for a little less from someone they did not want to sell to.* Mr. Owens also testified that in the course of a general discussion of investment property, Mr. Holderness told him that if one bought property in a "colored area" the value of the property would suffer.

Owens testified that he then left and conferred with DeWitt McDonald, who told him not to offer more than $27,500 and gave him $50 earnest money. *According to Owens' testimony he executed an offer to purchase the property for $27,500 at approximately 11:00 A.M. on July 28, and Holderness informed him at approximately 4:00 P.M. the same day that the offer had been accepted by the Verbles.*

Holderness testified that it was his recollection that Owens came into his office on July 26th, and that he returned on July 28 and executed an offer to purchase for $27,-500. Holderness did not offer testimony to dispute Mr. Owens' testimony about what

was discussed between the two regarding the other prospective buyer. Regarding Owens' testimony about Holderness' comments about purchasing property in "colored areas", Holderness testified that he used the words "depressed areas," and did not equate depressed areas with "colored areas."

21) Mr. Holderness testified that he took DeWitt McDonald's offer dated July 24th to the Verbles on that date, and that the Verbles stated they wanted to think about it. However, Mr. Verble testified that Holderness brought the offers for $26,500 and $27,500 to him on the same day.

22) It is undisputed that when Mr. Holderness took Mr. Owens' offer to the Verbles on July 28, 1975, Mr. Verble asked Mr. Holderness whether he would cut his commission from 10% to 7% if he accepted the offer for $27,500. Mr. Holderness so agreed.

23) *Raymond and Bonnie Verble signed the Acceptance Form on the bottom of Gerry Owens' offer to purchase on July 28th. The Verbles rejected the McDonald offer of July 24th on July 28th also.*

24) Mr. Holderness thereafter called Mr. McDonald and told him that his offer of July 24, 1975, for $26,500 had been rejected. *Mr. Holderness admitted on cross examination that after Mr. Owens placed his offer for $27,500, he did not contact DeWitt McDonald to inform him of the offer or encourage him to "up" his own bid.*

25) After the McDonalds were informed that their offer of $26,500 had been rejected, they contacted the NAACP in Sandusky. They then met with Mr. Houston of the NAACP, who indicated that he would investigate the matter.

26) Mr. Houston contacted the defendants concerning plaintiffs' claims of discrimination on August 1, 1975.

Mr. Holderness, in a letter dated August 4, 1975, informed Mr. Houston that if the present purchaser of the property was unable to complete the transaction, the Verbles were willing to sell the property to the McDonalds for $27,500. . . . .

\* \* \* \* \* \*

28) Gerry Owens testified that Mr. Holderness discussed financing with him several times, both before and after July 28, 1975. According to Owens' testimony, Mr. Holderness told Owens that the owners might be able to help with financing the purchase.

29) On August 11, 1975, Gerry Owens informed Mr. Holderness that he was withdrawing his offer to purchase the property. Mr. Holderness called DeWitt McDonald the same day and informed him that the other offer had fallen through.

30) On August 12, 1975, DeWitt and Ella McDonald submitted an offer to purchase the McArthur Park property for $26,500. The McDonalds placed $50 down as earnest money.

31) Mr. Holderness submitted the McDonalds' offer to purchase for $26,500, dated August 12th, to the Verbles. Mrs. Verble testified that she called their attorney, Mr. Ferwin, regarding the offer, . . . . The Verbles thereafter rejected the McDonalds' offer to purchase for $26,500, and Mr. Holderness so informed the plaintiffs.

32) *On August 15, 1975, the McDonalds went to the office of Real Estate One and executed an offer to purchase the Verbles' property for $27,500. Mr. Holderness took the offer to purchase to the Verbles on the same day, and the Verbles rejected the offer on that date. Mr. Verble then stated that they would not sell the property for anything less than $29,500, and that unless he got that price, he would take the property off the market.*

33) *At trial Mr. Verble testified that the only reason that he rejected the McDonalds' offer of $27,500 on August 15th was "advice of counsel." Mr. Verble did not indicate what the advice of counsel was.*

34) Mr. Verble testified at trial that the only offers he ever got for the property were those of Mr. Owens and Mr. McDonald, although others did view the property.

35) Plaintiffs filed this action on October 8, 1975. They alleged that the defendants had refused to sell them the McArthur Park

property for racially discriminatory reasons. *On October 9, 1975, this Court entered a temporary restraining order restraining the defendants from conveying the McArthur Park property to any persons other than the plaintiffs.*

36) By letter dated October 14, 1975, Mr. Holderness informed the plaintiffs that the Verbles, through their attorney John Kerwin, had withdrawn their rejection of plaintiffs' offer to purchase and had accepted said offer to purchase for $27,500.

37) After negotiations between the parties, through counsel, the McDonalds and the Verbles executed a Purchase Agreement on November 28, 1975. The plaintiffs took possession of the property on February 1, 1976.

\* \* \* \* \* \*

39) *DeWitt McDonald and Ella McDonald testified that they were upset, embarrassed and humiliated by the actions of the defendants, which they perceived to be based on race.*

40) On August 15, 1975, when plaintiffs matched the offer of $27,500 of Gerry Owens, there was no conceded reduction of the 10% commission called for by the listing agreement, . . . .

\* \* \* \* \* \*

On these findings which we accept as valid, the District Judge surprisingly concluded that the complaint "should be and hereby is dismissed at plaintiffs' cost." His rationale for doing so is set forth in two brief paragraphs:

> Although negotiations went forward with reluctance on the part of the defendants, no denial of sale or making unavailable the subject property occurred, nor was there any discrimination in the terms, conditions or privileges of sale, as proscribed by 42 U.S.C. § 3604, subsections (a) and (b).

> Although Defendant Holderness was reluctant to disclose the availability of the subject property, the availability was known to the plaintiffs, and their offer, through Gerry Owens, was part of the negotiating process and constitutes no violation of 42 U.S.C. § 3604, subsection (d).

 Our review of the District Judge's conclusions against the detailed findings of fact which precede them convinces us that both the spirit and the letter of the federal statutes dealing with fair housing were repeatedly violated by both defendants Verble and Holderness, that the violations were not cured by the ultimate transfer of this property to plaintiffs, and that the judgment previously entered in this case must be vacated and the case remanded for determination of damages and costs in favor of plaintiffs.

Since 1866, when Congress sought to spell out the civil rights of the newly freed slaves, federal law has recognized the right to purchase and own a house as a fundamental part of American citizenship.

### § 1982. Property rights of citizens

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982 (1976).

Since 1968 federal law has also provided:

### § 3604. Discrimination in the sale or rental of housing

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling

that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin.

42 U.S.C. § 3604 (1976).

As to defendant Dewitt, Verble, his initial indication, that "he preferred not to sell the property to blacks" was effectively implemented when the Verbles rejected the McDonalds' offer of $27,500 on August 15, 1975 although the Verbles had previously wanted to sell to a white buyer at the same figure. The District Judge noted and apparently relied upon the fact that at Verble's suggestion, Holderness agreed to reduce his commission by 3% which would have increased the Verbles' net by $825. There is no indication, however, that in rejecting the McDonald offer, Verble and Holderness ever discussed a similar commission reduction.

The fact that subsequent to the filing of a lawsuit, the sale of the property was consummated with the McDonalds, does not alter the prior discriminatory conduct. Nor does that fact wipe out the need for consideration of damages. Much less does it serve to justify the award of costs to the offending parties on this record and against the McDonalds who were the offended parties.

■ As to defendant Holderness, we observe that at his entrance into this series of negotiations, he accurately informed defendant Verble of the requirements of federal law banning racial discrimination in the sale of housing. Yet later he failed to tell the McDonalds of the listing of the Verbles' property until forced to do so and still later he clearly made available information to a white prospect which he had not made available to a willing black buyer.

We read these actions as violative of the letter and spirit of 42 U.S.C. § 3604(a), (b) and (d).

Twelve years ago, just before § 3604 was enacted, the Supreme Court pointed out in *Jones v. Alfred H. Mayer Co.*:

[T]his Court recognized long ago that, whatever else they may have encompassed, the badges and incidents of slavery—its "burdens and disabilities"—included restraints upon "those fundamental rights which are the essence of civil freedom, namely, the same right . . . to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens." *Civil Rights Cases*, 109 U.S. 3, 22, 3 S.Ct. 18, 29 [27 L.Ed. 835]. Just as the Black Codes, enacted after the Civil War to restrict the free exercise of those rights, were substitutes for the slave system, so the exclusion of Negroes from white communities became a substitute for the Black Codes. And when racial discrimination herds men into ghettos and makes their ability to buy property turn on the color of their skin, then it too is a relic of slavery.

Negro citizens, North and South, who saw in the Thirteenth Amendment a promise of freedom—freedom to "go and come at pleasure" and to "buy and sell when they please"—would be left with "a mere paper guarantee" if Congress were powerless to assure that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man. *At the very least, the freedom that Congress is empowered to secure under the Thirteenth Amendment includes the freedom to buy whatever a white man can buy, the right to live wherever a white man can live. If Congress cannot say that being a free man means at least this much, then the Thirteenth Amendment made a promise the Nation cannot keep.* (Emphasis supplied).

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 441–443, 88 S.Ct. 2186, 2204–2205, 20 L.Ed.2d 1189 (1968) (footnotes omitted).

Relying upon the Thirteenth Amendment and the 1866 Civil Rights Act, 42 U.S.C. § 1982 (1976), the Supreme Court held that there was a federal cause of action against private parties for racial discrimination in the sale or rental of housing.[1]

One year later in 1969, after the enactment of § 3604,[2] the Supreme Court reiterated its commitment to these principles in *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 235–236, 90 S.Ct. 400, 403–404, 24 L.Ed.2d 386 (1969).

The Eighth Circuit has spelled out still further the implications of the Supreme Court holdings:

> Recent cases make clear that the statutes prohibit all forms of discrimination, sophisticated as well as simpleminded, and thus disparity of treatment between whites and blacks, burdensome application procedures, and tactics of delay, hindrance, and special treatment must receive short shrift from the courts. *See United States v. Pelzer Realty Company, Inc.*, 484 F.2d 438 (5th Cir. 1973); *United States v. Youritan Construction Company*, 370 F.Supp. 643 (N.D.Cal.1973); *Hall v. Freitas*, 343 F.Supp. 1099 (N.D.Cal. 1972); *Newbern v. Lake Lorelei, Inc.*, 308 F.Supp. 407 (S.D.Ohio 1968); *Brown v. Lo Duca*, 307 F.Supp. 102 (E.D.Wis.1969).

*Williams v. Matthews Co.*, 499 F.2d 819, 826 (8th Cir.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294 and 1027, 95 S.Ct. 507, 42 L.Ed.2d 302 (1974).

Although the Fair Housing Act's enforcement section, § 3612, limits relief beyond actual damages, court costs and reasonable attorney fees to $1,000 punitive damages, the courts have read this statute in conjunction with the older § 1982, and the recent § 1988 which impose no such limitations.

In *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), the Supreme Court also discussed the remedies available for violations of the civil rights statutes:

> . . . Congress, by 28 U.S.C. § 1343(4), created federal jurisdiction for "damages or . . . equitable or other relief under any Act of Congress providing for the protection of civil rights . . .."

> \* \* \* \* \* \*

> The existence of a statutory right implies the existence of all necessary and appropriate remedies. . . .

Compensatory damages for deprivation of a federal right are governed by federal standards, as provided by Congress in 42 U.S.C. § 1988, which states:

> "The jurisdiction in civil . . . matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said court in the trial and disposition of the cause . . .."

This means, as we read § 1988, that both federal and state rules on damages

---

**1.** This Court has recently cited and relied on *Jones* in ordering relief for the discriminatory closing of a thoroughfare in Memphis, Tennessee, holding that a barrier barring traffic at the boundary between a black and white residential district was a "badge of slavery." *Greene*

*v. City of Memphis*, 610 F.2d 395 (6th Cir. 1979).

**2.** Section 3604 was not, however, directly applicable to the events involved in *Sullivan v. Little Hunting Park, Inc.*, since those events took place before its enactment.

may be utilized, whichever better serves the policies expressed in the federal statutes. Cf. *Brazier v. Cherry* (5 Cir.), 293 F.2d 401. The rule of damages, whether drawn from federal or state sources, is a federal rule responsive to the need whenever a federal right is impaired.

*Sullivan v. Little Hunting Park, Inc.,* 396 U.S. at 238–40, 90 S.Ct. at 405–406 (1969). *See also, Rogers v. Loether,* 467 F.2d 1110, 1112 (7th Cir. 1972), aff'd sub nom. *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1975); *Parker v. Shonfeld,* 409 F.Supp. 876, 879–881 (N.D.Cal.1976); and the 1976 Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988 (1976).

The judgment of the District Court is vacated, and the case is remanded for determination of damages, costs and attorney fees in favor of plaintiffs.