Joe POLLITT, et al., Plaintiffs,

v.

Louis BRAMEL, et al., Defendants.

No. C–1–86–983.

United States District Court,
S.D. Ohio, W.D.

Sept. 10, 1987.

Robert F. Laufman, Cincinnati, Ohio, Debra S. Spaulding, Rigg Law Office, Maysville, for plaintiffs.

R. Gary Winters, Cincinnati, Ohio, for defendants.

## ORDER

HERMAN JACOB WEBER, District Judge.

This matter is before the Court after a trial to the bench. This Court does hereby submit Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52.

This action was brought pursuant to the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982 and the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.* Plaintiffs seek preliminary and permanent injunctions to issue enjoining defendants from any further acts in violation of 42 U.S.C. §§ 1981, 1982 and 3601 *et seq.*, compensatory and punitive damages, attorney fees and costs.

Plaintiffs are husband and wife. She is white; he is black. Plaintiff, Mrs. Pollitt, attempted to rent a mobile home from defendants, also husband and wife. Plaintiffs allege that defendants promised to rent them the home but contacted them later to inform them that it had been promised to another couple. Plaintiffs claim that this rejection occurred only after defendant, Mrs. Bramel, found out that plaintiff, Mr. Pollitt, is black.

Defendants deny telling plaintiff, Mrs. Pollitt, that she could rent the mobile home. Defendants claim that they advised plaintiffs that the mobile home may have already been promised to another couple and that they would call to inform plaintiffs if it was available. Defendants deny that they knew Mr. Pollitt is black.

## FINDINGS OF FACT

1) Plaintiff Kelly Pollitt is white. Plaintiff Joe Pollitt is black. They were married on April 18, 1986 and live in Maysville, Kentucky.

2) Defendants Clara Bramel and Louis Bramel are white. They own and operate Bramel's Trailer Court in Aberdeen, Ohio, and have done so since 1965. In June, 1986, Bramel's Trailer Court consisted of 34 trailers and doublewide mobile homes held for rental by the defendants, as well as numerous owner-occupied units.

3) On June 9, 1986 Kelly Pollitt made an inquiry concerning a 3–bedroom singlewide trailer home advertised for rent. Clara Bramel inquired of the number in her family. When Kelly Pollitt stated that she had a six-year old and was expecting, Clara Bramel stated she had a 4–bedroom doublewide coming available soon for $25.00 per month more. Pollitt stated that for only $25.00 extra she would prefer the doublewide.

4) Between June 9 and June 16, 1986, Kelly Pollitt phoned Clara Bramel several times. At some point during this time, Pollitt told Clara Bramel to leave telephone messages with Joan Waldren, Kelly Pollitt's mother, as the Pollitts had no telephone. On June 16, 1986, Pollitt telephoned Bramel and was given an appointment for Wednesday June 18, 1986 for 1:00 P.M.

5) On June 18, 1986 at 1:00 P.M., Kelly Pollitt went to the Bramel Trailer Court with her friend, Barbara Tucker. Clara Bramel directed Kelly Pollitt to a doublewide trailer home at 30 Fifth Street which was available for occupancy although minor repairs were needed. After Pollitt and Tucker inspected the trailer, they returned to talk to Bramel, who told Kelly Pollitt that she and Joe Pollitt could rent the trailer home but that they could not move in until the following Monday at which point the repairs would be completed. Bramel instructed Pollitt as to the procedure concerning the utilities. Bramel told Pollitt to pay both the deposit and first month's rent on Monday. Bramel questioned Pollitt

extensively about her husband, his employment, activities, and local references.

6) It is agreed by all participants that the subject of Mr. Pollitt's race did not enter into the discussion. At the end of the discussion, Clara Bramel had not been informed that Mr. Pollitt is black.

7) On the evening of June 18, 1986, Kelly Pollitt took her husband, Joe Pollitt, to the Bramel Trailer Court to show him the trailer she had rented. They had to drive past Bramel's house twice. Both times Clara Bramel was in front of the house and looked at them.

8) That evening, on June 18, 1986, Kelly Pollitt began packing all of the family's household goods to be moved to the trailer home the following Monday.

9) That night, after 11:00 P.M., Clara Bramel telephoned Kelly Pollitt's mother, Joan Waldren, to say that the trailer home promised to the Pollitts had been promised to another, but that she would notify her when another became available. She did not mention that two other trailers were vacant and did not offer them to plaintiffs.

10) Harry and Peggy Hughes were tenants at the Bramels' Maysville, Kentucky house located in the path of the AA Highway. That house was to be moved by Mr. Bramel upon notice from the Commonwealth of Kentucky. This was known to the Bramels and Hugheses when the house was rented to the Hugheses in November, 1985.

11) In March, 1986, the Hugheses received a letter from the Commonwealth of Kentucky. Thereafter, Mrs. Hughes had conversations with Mr. Bramel in which Mr. Bramel advised her that the Hugheses could move into Bramel's Trailer Court if a suitable trailer was available when needed.

12) On June 13, 1986, the Hugheses received a second letter from the Commonwealth of Kentucky. On June 14, 1986 or June 15, 1986, Peggy Hughes advised Louis Bramel of the letter, and was told by Mr. Bramel on that date that there was an available mobile home for them in Bramel's Trailer Court.

13) On June 19, 1986, Peggy Hughes was shown the trailer home the Bramels had chosen for them. The Hugheses began moving items into the trailer on approximately June 20, 1986, and moved their family into it on June 22, 1986.

14) On June 19, 1986, defendants had a total of three trailers available. Defendants were aware that plaintiffs had only a six-year old daughter and Kelly Pollitt was five and one-half months pregnant, so that either of the three-bedroom trailers would have been satisfactory.

15) Although Clara Bramel told plaintiff's mother she would let her know when a trailer became available, Clara Bramel never again contacted plaintiff's mother or the plaintiffs.

16) When Bramel failed to contact them, the Pollitts contacted Housing Opportunities Made Equal ("H.O.M.E") which sent testers to the Bramel Trailer Court.

17) On July 9, 1986, Clara Bramel showed Lou Marti and James Sales, two white testers posing as a married couple, a three-bedroom at 176 Elm renting for $225.00 and told them there was a two-bedroom trailer renting for $200.00. Both were available for immediate occupancy. Clara Bramel stated that the trailer court was never fully rented since work stopped on the power plant.

18) On July 25, 1986, Steve Best, a black tester, called for an appointment. He arrived for his 3:00 P.M. appointment about 3:35 and inquired about renting a trailer. He did not specify any particular size. He was told by Louis Bramel that the last one had been rented at noon. He was told to check back but did not.

19) On July 25, 1986, there were four trailers available for rent.

20) In 1983, defendants told Wally Martin that they preferred the Martins not rent to a black man.

21) In 1983, Victor McKay referred a black couple, who wanted to rent a trailer, to the Bramel trailer court. About an hour later, Clara Bramel, came to Aberdeen Trailer Sales, where McKay worked, and told him not to send anyone to her trailer

court as she did not have trailers to rent, although Bramel's trailer court has been in the business of renting trailers from its inception.

22) On June 18, 1986, plaintiff Kelly Pollitt was five and one-half months pregnant. That night, after she had been promised the trailer, Kelly Pollitt packed most of their possessions in preparation of their anticipated move into the Bramel's trailer park. Joe Pollitt testified that the incident put a strain on their marriage and that his wife had mood swings after the incident. She had not been experiencing swings prior to the incident. The Bramel trailer park was a better place to live than their apartment and they had been looking forward to moving. Following the incident, they were afraid to look for another place to live for fear the same thing would occur again.

### CONCLUSIONS OF LAW

1) The trailers at Bramel's Trailer Court are dwellings within the meaning of Section 802(b) of the Fair Housing Act of 1968, 42 U.S.C. § 3602(b).

2) This Court has jurisdiction of this action under 28 U.S.C. §§ 1343(3) and (4), and 42 U.S.C. §§ 3612 and 3617.

3) The Court finds that defendants are in the business of selling or renting dwellings, as defined by Section 3603(c) of the Act.

4) Section 3604(a) of the Act states that it shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

5) Section 3604(d) of the Act states in pertinent part that it shall be unlawful—

(d) To represent to any person because of race, color, religion, sex or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

Disparate treatment on the basis of race violates the Fair Housing Act, 42 U.S.C. § 3601 *et seq. McDonald v. Verble*, 622 F.2d 1227, 1233 (6th Cir.1980). Disparate treatment on the basis of race violates the Civil Rights Act of 1968. 42 U.S.C. §§ 1981 and 1982. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

6) The three-part burden of proof test, established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817; 36 L.Ed.2d 668 (1973), is to be applied in this case, where the same evidence provided the basis for the Pollitts' Fair Housing Act claim and their §§ 1981 and 1982 claims. First, the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. *Id.* at 802; 93 S.Ct. at 1824. Second, if the plaintiff sufficiently establishes a prima facie case, the burden shifts to the defendant to "articulate some legitimate, undiscriminatory reason" for its action. *Id.* Third, if the defendant satisfies this burden, the plaintiff has the opportunity to prove by a preponderance that the legitimate reasons asserted by the defendant are in fact mere pretext. *Id.* at 804, 93 S.Ct. at 1825.

Courts have uniformly held that a plaintiff establishes a prima facie case under either 42 U.S.C. § 1981, § 1982 or 42 U.S.C. § 3601 *et seq.* by proving:

1) That he or she is a member of a racial minority;

2) That he or she applied for and was qualified to rent or purchase certain property or housing;

3) That he or she was rejected; and

4) That the housing or rental property remained available thereafter.

*Selden Apts. v. U.S. Dept. of Housing & Urban Development*, 785 F.2d 152 (6th Cir. 1986).

This Court finds that the plaintiffs met their burden of proving a prima facie case of discrimination by a preponderance of the evidence. There is no conflict in testimony concerning the facts that Joe Pollitt is black, that Kelly Pollitt was an aggrieved party, Kelly Pollitt applied for the trailer home, was promised the home and later refused the opportunity to rent the home and the particular trailer was not shown to Peggy Hughes until the next day.

The Bramels were in a position to offer one of several other trailers to the Hugheses and to plaintiff, all of which were available. There is no dispute over whether the Pollitts were qualified to rent from the Bramels. Defendant's testimony was that she would have rented to the Pollitts but for the Hugheses and even now if Kelly Pollitt would have called her back.

In an attempt to rebut the presumption of unlawful discrimination created by the establishment of a prima facie case, *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the defendants assert as their non-discriminatory reason for rejecting the plaintiffs, their prior commitment to the Hughes family.

Initially, the Court notes that Mrs. Bramel alone, had been managing the trailer park property for several years.

While lawsuits of this nature are rife with "promises to call," Clara Bramel's version of the chain of events was that she had told Kelly Pollitt that she would call and leave a message for Kelly Pollitt only if she *did* have the trailer. Yet, Bramel called the plaintiff's mother to inform her that plaintiff could not have the trailer. Further, Mrs. Bramel testified that immediately after talking to Mrs. Pollitt, Mrs. Bramel drove to her husband's farm, returned home around 10:00 P.M. and immediately called Mrs. Pollitt's mother. How, then, could both of the plaintiffs have seen her outside her trailer that evening, long before a call was made to Kelly Pollitt's mother? This combination of incongruities supports the Court's finding that the defendants' version of the story was pretextual rather than a legitimate reason for rejecting the plaintiffs as tenants of their trailer park.

The Court views the plight of the Hugheses to have been a convenient coincidence, complete with dated documents, available for use by the defendants in an attempt to disguise their true reason for denying the plaintiffs a trailer home after promising it to plaintiffs. This view is supported by the testimony of Mrs. Hughes that she was not shown the trailer into which her family would move until after the Pollitts were denied. The Court finds the defendants' undiscriminatory reason for their actions to be pretextual.

In additional support of this finding, Mrs. Bramel was in the business of renting trailers. She had other trailers available on the day in question and additional trailers were becoming available within a few weeks. Testimony was that Mrs. Bramel said she would call Mrs. Pollitt if anything became available. She did not. Since they have offered no other objective criteria for rejecting plaintiffs, the only conclusion to be drawn is that the defendants did not want to rent to the Pollitts because of race.

Having found that defendants failed to rebut the presumption of discrimination, the factual inquiry need not proceed further.

■ 7) The Court need not find that race is the only factor. Under 42 U.S.C. §§ 1981 and 1982, a plaintiff is not required to prove that the challenged action rested solely on racially discriminatory purposes. *Vil. of Arlington Hts. v. Metro. Housing Dev.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). "[O]ther circuits have clearly and repeatedly found liability when race was only one factor, rather than the sole reason for refusal to sell." *Green v. Century 21,* 740 F.2d 460, 464 (6th Cir.1984). The evidence presented in this case evidenced a pattern of discrimination. The testimony taken as a whole reasonably permits an inference that the defendant refused to rent to plaintiffs for reasons other than the one offered.

■ 8) Plaintiffs have prayed for compensatory damages. In calculating the amount of compensatory damages, the Court is required to consider not only out-of-pocket expenses, but also the emotional distress and humiliation suffered by the plaintiffs. Based on the evidence, plaintiffs have out-of-pocket expenses for a therapist, have been forced to remain in less desirable housing, and have suffered from humiliation and emotional distress. Accordingly, the Court awards $25,000.00 compensatory damages against all defend-

ants who shall be liable jointly and severally.

9) Plaintiffs have prayed for punitive damages. Although the Fair Housing Act limits punitive damages to $1,000.00, the courts have read the statute in conjunction with § 1982 and § 1988 which impose no such limitations. *McDonald v. Verble*, 622 F.2d 1227, 1234 (6th Cir.1980). Accordingly, courts have not hesitated to award punitive damages far in excess of $1,000.00 in housing cases involving racial discrimination.

Punitive damages shall be granted only in those cases under 42 U.S.C. § 1982 and § 3604 in which the court finds that the defendant acted wilfully and in wanton and malicious disregard for the rights of the plaintiffs. The Court has found that defendants acted wantonly and maliciously and in wilful disregard for the rights of Mr. and Mrs. Pollitt. The Court awards $25,000.00 as punitive damages against all defendants who shall be liable jointly and severally.

10) Reasonable attorney fees may be awarded under 42 U.S.C. § 3612(c) to a prevailing party, provided that the plaintiffs are unable to assume the burden of attorney fees. *See Marr v. Rife*, 503 F.2d 735 (6th Cir.1974).

Although prayed for in the Complaint, plaintiffs put on no evidence of their inability to assume the burden of attorney fees in this case. Certainly, plaintiffs now have the means to pay attorney fees from the punitive damage award. The Court is therefore unable to make such an award. The Court taxes costs against the defendants.

11) Having determined that the defendants have committed racial housing discrimination, the Court hereby issues a permanent injunction against all defendants restraining defendants from further violations of Title VII or 42 U.S.C. § 1981, 1982 and 3601 *se seq.*

Judgment is hereby ORDERED in favor of plaintiffs Kelly and Joe Pollitt against defendants Louis and Clara Bramel. The Court hereby AWARDS compensatory damages in the amount of $25,000.00 and punitive damages in the amount of $25,000. Defendants are assessed costs.

IT IS SO ORDERED.