**Thomas C. BAUMGARDNER, Petitioner,**

v.

**The SECRETARY, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, on behalf of Blanton B. Holley, Respondent.**

No. 91–3039.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 8, 1991.

Decided March 31, 1992.

any reservation, we do not reach the question of whether the reservation must be writing.

Mark L. Resler, Cincinnati, Ohio (argued and briefed), for Thomas C. Baumgardner, petitioner.

Leslie A. Simon (briefed), Jessica D. Silver (argued), U.S. Dept. of Justice, Civ. Rights Div., Appellate Section, Robert E. Kopp, Dept. of Justice, Appellate Staff, Civ. Div., David H. Enzel, Memmi M. Stubbs, U.S. Dept. of Housing and Urban Development, Washington, D.C., for Secretary, U.S. Dept. of Housing and Urban Development, on behalf of Blanton B. Holley, respondent.

Stephen M. Dane (briefed), Cooper, Straub, Walinski & Cramer, Toledo, Ohio, for National Fair Housing Alliance and Nat. Neighbors and Housing Opportunities Made Equal, Inc., amicus curiae.

Frederick M. Morgan, Jr. (briefed), Montgomery, Rennie & Jonson, Cincinnati, Ohio, for Blanton B. Holley, respondent-intervenor.

Before: JONES and SUHRHEINRICH, Circuit Judges; and WELLFORD, Senior Circuit Judge.

WELLFORD, Senior Circuit Judge.

Blanton B. Holley, who lived in the Walnut Hills area of Cincinnati, Ohio, called a telephone number listed on a rental sign at nearby 2343 Victory Parkway. The rental sign advertised a four-bedroom home owned by petitioner, Thomas C. Baumgardner. Holley talked to Baumgardner in early January, 1989, who gave him information about monthly rental and estimated utility bills. There is some divergence in testimony about the details of the balance of the conversation. Holley's version is that Baumgardner asked about the proposed use of the house and who would be living there with him. Upon being advised that Holley and three male friends planned to live there, Baumgardner inquired whether they were students. Holley testified that he told Baumgardner all were employed adults, whereupon Baumgardner stated, "I'm not interested in renting to males. My past experience has been that males are messy and unclean."

Baumgardner, on the other hand, testified that he had no specific recollection of any such conversation, but did remember a phone call inquiry from a male at about the date and time specified by Holley about the home in question. He claimed that the caller, whose identity he could not recall, would not answer his questions about who would be living in the house or about their employment and that he hung up during the conversation. Baumgardner stated that he was again called later by this "completely uncooperative" male. Baumgardner conceded, however, "I honestly do not recall the bits of what went on in the conversations because I have so many over the phone in any given day." Baumgardner's business was rental or residential real estate units, and he estimated that he received about 20 calls a day but did not keep any detailed records or logs about the contents of these calls from applicants or tenants.

Baumgardner had, in fact, difficulty with males damaging this rental property previously. He personally screened rental applicants at this location, one of about seventy-five or eighty rental housing units he owned and rented on an integrated basis to both males and females. He had also used the 2343 Victory Parkway location as an office from time to time since 1983.

Holley filed a complaint alleging denial of rental accommodation based on his gen-

der (and that of his prospective male roommates) under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* Staff of the Department of Housing and Urban Development (HUD) investigated the complaint, following which HUD's general counsel issued a probable cause determination and a formal charge of gender discrimination against Baumgardner in 1990. After a hearing, an administrative law judge (ALJ) issued a lengthy "initial decision" on November 15, 1990, which determined that Baumgardner was guilty as charged of intentional discrimination, assessed $5,000 in actual damages and an additional $4,000 as a civil penalty, and ordered extensive injunctive relief. This appeal ensued. We AFFIRM the determination of liability, but REVERSE on the issues of damages and injunctive relief.

The ALJ determined that Holley called Baumgardner on January 19, 1989, and that he had responded to the inquiry "that he did not want to rent to males because his experience was that they did not keep a clean house." The ALJ found that Holley had invited Baumgardner to come to his "close by apartment" to see that he and his roommates "maintain a clean home," but to no avail. The ALJ also found that Baumgardner "refused to allow" Holley "and his friends an opportunity to inspect the house," stating in response to Holley's persistence that "he was no longer interested in renting the house but would take it off the market." The "For Rent" sign, however, remained in the front yard of the house "for some weeks."

Holley promptly called an organization funded by private and public grants which deals with fair housing complaints, HOME, in Cincinnati to register his complaint. HOME has a substantial staff to look into complaints concerning fair housing violations and make investigations. The next day HOME initiated visits to the subject property by various testers. A female tester was permitted by petitioner to view the house for renting to her and other members of her family. When a later female tester called to inquire about the property in February, Baumgardner indicated that he was considering using it as his office but would rent to her. A male tester, upon calling Baumgardner's office in March, was told that he had decided to convert the house into offices. Later in March, however, Baumgardner rented the house to a female with children. HOME (and later HUD) concluded that Baumgardner treated males and females differently with regard to renting this property. Upon a careful examination of the record, we are of the view that there is substantial evidence to support this conclusion, and that the ALJ was in the better position to make what was essentially a credibility determination on the content and effect of the Holley/Baumgardner conversations. Holley felt "offended, hurt, insulted and angered" by his rejection, according to his testimony and as found by the ALJ. A male friend moved in with Holley in his apartment inconveniencing him "for a couple of months" after Baumgardner refused Holley's expression of interest. The ALJ also found that Holley "now lives alone" and is uninterested in renting from Baumgardner.

## I. PROCEDURAL ISSUES

HUD, as found by the ALJ, first contacted Baumgardner in this matter on or about April 3, 1989, and it then "sent him in error a housing discrimination complaint" about a house in East Chicago, Indiana. Along with this mistaken notice was a letter to Baumgardner from the HUD Chicago office referring to HUD investigator Jung, his phone number, and the subject "Holley v. Baumgardner, HUD case number 5–89–305–1, filing date March 21, 1989." The letter notified Baumgardner of a complaint that he had "engaged in discriminatory housing practices," and might file a sworn response within 10 days, and that an investigator would discuss the case with him. Holley's sworn complaint to HUD, however, was filed with HOME February 28, 1989, based on the January 19 call or calls. Baumgardner ignored the April 3, 1989 communication with the erroneous complaint enclosure. Jung did not commence investigation until August of 1989; he found Baumgardner "uncooperative." He used HOME's investigation and a contact

with Holley as a basis for his final report recommending a formal complaint by the agency.

42 U.S.C. § 3604 describes, in pertinent part, unlawful acts:

(a) To refuse ... to negotiate for the ... rental of, or otherwise make unavailable or deny, a dwelling to any person because of ... sex....

....

(c) To make, print, or publish ... any statement ... with respect to the ... rental of a dwelling that indicates any preference, limitation, or discrimination based on ... sex, ... or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of ... sex ... that any dwelling is not available for inspection ... or rental when such dwelling is in fact so available.

Regulations issued under § 3604 further provide descriptions of prohibited conduct:

1. refusing to rent a dwelling to any person because of sex. 24 CFR 100.-60(b)(2);

2. engaging in any conduct relating to the provision of housing that otherwise makes unavailable or denies dwellings to persons because of sex. 24 CFR 100.-70(b);

3. discouraging any person from inspecting or renting a dwelling because of sex. 24 CFR 100.70(c)(1);

4. using words or phrases which convey that dwellings are not available to a particular group of persons because of sex. 24 CFR 100.75(c)(1);

5. expressing to prospective renters or any other persons a preference for or limitation on any renter because of sex. 24 CFR 100.75(c)(2); and

6. providing false or inaccurate information regarding the availability of a dwelling for rental to any person, regardless of whether such person is actually seeking housing, because of sex. 24 CFR 100.80(b)(5).

 Baumgardner maintains that HUD violated its own regulations and the law in handling Holley's complaint thereby depriving him of his due process rights, and asks that this action be dismissed. Next, he claims that there was no real effort at conciliation, and that HUD did not complete its investigation within 100 days nor give him notice as to reasons for any delay within that time frame. Finally, he complains that he was not promptly furnished the final investigative report with exhibits, not even after requesting a copy thereof.

As noted by the ALJ, HUD not only failed to send Baumgardner a copy of the complaint within ten days, but it also sent out an erroneous copy of the complaint after it was filed. The ALJ emphasized, however, that Baumgardner could have corrected this situation through a phone call, but failed to do so. He did not receive the correct copy until about six months later. Furthermore, the ALJ found, with a substantial basis in the record, that the delayed issuance of the final investigative report[1] was due to "HUD's procrastinations and mismanagement of the complaint."

The issue, then, is whether HUD's procedural noncompliance with 42 U.S.C. § 3610(a) of the act is a basis for dismissal.[2] We find no case law authority dealing with this issue. HUD argues in its brief that any failure under § 3610 constitutes harmless error, citing the Administrative Procedure Act, 5 U.S.C. § 706(2)(D), which it asserts applies to court review of agency action, and *EEOC v. Kimberly Clark Corp.*, 511 F.2d 1352 (6th Cir.), *cert. denied*, 423 U.S. 994, 96 S.Ct. 420, 46 L.Ed.2d 368 (1975) (dealing with Title VII and this court's review of a district court decision). *Kimberly Clark* holds that the EEOC's neglect to follow Title VII procedural requirements which "inflicts no sig-

---

**1.** This report was not issued until nearly a year and a half after the episode occurred.

**2.** Subsection (a)(1)(B)(ii) requires that the Secretary *"shall"* serve notice of the complaint *"not later than* 10 days after such filing," which identifies "the alleged discriminatory practice ... together with a copy of the original complaint." (Emphasis added).

nificant injury on the party entitled to observance," should be considered "harmless error." *Id.* at 1360. HUD argued, moreover, only that it "actually failed to comply with only one procedure" mistakenly serving notice, three days late, of the wrong complaint.[3]

What is involved here is not just the failure of HUD to follow its own procedural rules; it is, rather, a failure to follow a statutory mandate reflecting the congressional determination that a short period of time for notice was important after an alleged violation so that parties concerned proceed promptly to negotiate or conciliate with events fresh in the minds of witnesses. *Kimberly Clark,* 511 F.2d at 1552, dealt with a different statute involving, in many instances, ongoing employment relationships. In that context, the court held that EEOC's failure "to follow a *procedural rule*" when no "significant injury" resulted from the failure did not preclude judicial action. *Id.* at 1360 (emphasis added). The Supreme Court case cited in support of that rationale was *American Farm Lines v. Black Ball,* 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970), a case which dealt with the ICC's "own rules." There, the failure to list in detail a complete list of names and addresses of all carriers who refused to provide transportation services was deemed "not [to] prejudice the carriers in making precise and informed objections." *Black Ball,* 397 U.S. at 538, 90 S.Ct. at 1292. Accordingly, the Court held:

"[i]t is always within the discretion of a court or an administrative agency to relax or modify its *procedural rule* adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party."

*NLRB v. Monsanto Chemical Co.,* 205 F.2d 763, 764.

*Id.* 397 U.S. at 539, 90 S.Ct. at 1292 (emphasis added). The above principle was adopted because the procedural rules in question were "mere aids to the exercise of the agency's independent discretion." *Id.*

The situation in the instant case involving one single claimed offense at one of many properties rented by Baumgardner is readily distinguishable from *Kimberly Clark* and *Black Ball,* where there were many charges or many entries and items of information involved. A similar argument to that advanced by Baumgardner in this case was made in *Connor v. U.S. Civil Service Commission,* 721 F.2d 1054 (6th Cir.1985), a case involving a claim by a plaintiff, seeking to retain his position in the Army, that failure of the government agency in light of "applicable statutory provisions to follow its procedural rules" deprived him of due process. In that case we held that to be successful, Connor had to show "that he had been prejudiced on the merits or deprived of substantial rights." *Id.* at 1056. (Failure of a federal agency to adhere to a statutory notice was not involved in *Connor.) See also Shaw v. U.S. Postal Service,* 697 F.2d 1078 (Fed. Cir.1983); *Pascal v. United States,* 543 F.2d 1284, 211 Ct.Cl. 183 (1976); *compare Rasmussen v. United States,* 543 F.2d 134, 211 Ct.Cl. 260 (1976). We do not excuse or justify HUD's failure to adhere to the statutory standard of notice in this as did the ALJ by simply concluding that Baumgardner "could easily have brought to HUD's attention" the incorrect complaint. The burden is not cast upon a respondent to amend or bring about a correction of an inaccurate notice. Baumgardner was put on notice only that a complaint for discriminatory housing practice by someone named Holley, bearing a HUD case number, had been filed against him on March 21, 1989.

---

**3.** The complaint was signed February 28 and filed with HOME, which forwarded it to HUD, and it was then marked filed on March 21, 1989. HUD concedes that it "mistakenly" used the February 28 date in its determination of probable cause and in its charge of discrimination. Regardless of the correct date of filing, HUD's notice would not have been received by Baum-

gardner, at the earliest, until two weeks after the last date it was filed. HUD's notice did not comply with the statute also for failing to identify and to attach the correct Holley complaint reflecting the proper address of the property which was the subject of the complaint. Thus, there were at least two separate failures or omissions to comply with § 3610(a)(1)(B)(ii).

This was obviously an inadequate and insufficient statutory notice.

■ Whether Baumgardner was substantially prejudiced is a close question because he did not learn the date of the complaint until more than three months later. While Baumgardner was unwise not to keep more accurate records on telephone rental inquiries, the fact is that he was called upon many months later to recall the specifics of one of many hundreds of calls he had received on renting his various apartments or housing units. While we agree with the ALJ that "procedural shortcomings" alone are not a sufficient basis for dismissal, we must inquire about the nature and the effect of the procedural shortcomings as to notice in this case. Baumgardner was, at least, deprived of a prompt opportunity to effect a settlement or to offer the rental property (or its equivalent) to Holley who, for several months after January 1989, was still interested in renting the subject home.

The statutory scheme gives a complaining party up to a year to make a charge, and we recognize that Holley could lawfully have filed his complaint for a period many months after Baumgardner finally obtained adequate notice in this case about the nature (and location) of the Holley controversy. We consider this circumstance significant as to whether Baumgardner was substantially or willfully caused to be prejudiced in making a defense on the merits of Holley's complaint. Baumgardner's prejudice may well be greater on the damages question, which we will discuss subsequently.

While we perceive some degree of prejudice on the merits of Baumgardner's defense and some injury resulting from HUD's failure procedurally to comply with statutory notice, we are not prepared to hold that the prejudice, under the circumstances, was so substantial that HUD's complaint should be dismissed. The lateness of the notice was not material and it was within Baumgardner's ability, upon being alerted about a charge of discrimination, to inquire as to the specifics thereof. Such procedural failure, moreover, may risk dismissal in other circumstances, and we deem it important here on the issue of damages.

■ We next pass to the procedural specifications of 42 U.S.C. § 3610(a)(1)(B)(iv)(C), which require that:

> (iv) the Secretary shall make an investigation of the alleged discriminatory housing practice and complete such investigation within 100 days after the filing of the complaint ..., unless it is impracticable to do so.
>
> (C) If the Secretary is unable to complete the investigation within 100 days after the filing of the complaint ..., the Secretary shall notify the complainant and respondent in writing of the reasons for not doing so.

Delay by HUD in investigation beyond 100 days does not constitute a violation of § 3610 nor the regulations thereunder, because subsection (C) permits the Secretary to set out its reasons for the delay. There is an implied "good cause" basis for extending the period for investigation beyond 100 days. The notice sent out included that the Secretary would conclude the investigation within 100 days unless "impracticable" to do so.[4] HUD notified Baumgardner on or about August 8, 1989, that its increased caseload would delay processing. Under these circumstances, because the extension beyond 100 days was not lengthy and little actual prejudice was demonstrated, we conclude that there is no basis for dismissal on this account. We note, however, that the ALJ properly rejected HUD's attempt to explain its delay by blaming Baumgardner for not being cooperative. HUD's alleged attempts to contact or communicate notice about delay were deemed "frivolous" and furthermore did not issue within 100 days of filing the complaint.

■ The Secretary is directed under § 3610(b)(1) "to the extent feasible, to en-

---

**4.** 24 C.F.R. § 103.400(C)(1) interprets the statutory standard to be impracticality rather than good cause.

gage in conciliation with respect to the complaint." We are troubled in this case with a delayed and extended investigation incorrectly blamed by HUD on uncooperativeness coupled with cursory efforts to conciliate.[5] We do not agree with HUD's argument in its brief that "the statute [42 U.S.C. § 3610(b)(1)] leaves to HUD's discretion the question of whether further conciliation is 'feasible.'" We believe that an objective standard is indicated by the statute rather than leaving the entire matter of conciliation to the unbridled discretion of HUD. While a respondent is certainly not entitled to a successful conciliation, he is entitled to an objectively reasonable effort by the agency to bring about a settlement of the charge. In this case, there was a phone call contact and an unsuccessful meeting (video taped by Baumgardner); we cannot say this was not a "feasible" effort to conciliate nor can we say it was an unreasonable failure to adhere to the statutory direction in that regard. It was, however, little more than barely sufficient.

■ The ALJ found the final investigative report to have been filed late due to HUD's own mismanagement. While HUD was also late in furnishing this report to Baumgardner after his first request, he did receive it a number of weeks before the administrative hearing and in sufficient time to be prepared to respond to the charge. Such reports are to include summaries of correspondence and other contacts and summary descriptions of other records, among other items. While it would have been better to furnish Baumgardner copies of documents later made available at the hearing (and bringing about delays at the hearing on that account), we find no denial of due process in this respect.

In sum, the combination of problems attendant to HUD deficiencies in carrying out statutory procedures are seriously troubling in this case. We conclude that, even in combination, there was not a denial of due process, but these deficiencies do have an adverse effect with regard to ascertaining fair and reasonable damages as a consequence of this single episode of gender discrimination.

## II. LIABILITY

■ We have concluded that a finding of liability is supported by substantial evidence taking into account the critical determination of credibility in this controversy. There is substantial evidence that Baumgardner refused to negotiate for the rental of the house in question, because it was to be rented by males. Baumgardner refused to show the property to Holley and he allowed females to examine it, and there is evidence that he represented that the house was not available for inspection or rental based on the sex of Holley and his friends. Although a question not free of doubt, we AFFIRM the determination of liability.

We recognize, at the same time, that the Act did not preclude Baumgardner from investigating the background, financial ability, and general responsibility of Holley and any other applicant because of his prior bad experience with tenants, so long as he did not discriminate based on race, color, sex or any of the other bases specified in the Fair Housing Act, as amended. In this case we find no prejudicial error in the administrative hearing mandating reversal of the determination of liability.[6] The standard of review is whether the findings of fact are supported by substantial evidence on the record as a whole. *Secretary, HUD v. Blackwell*, 908 F.2d 864, 870 (11th Cir. 1990). We are satisfied that the ALJ could reach a conclusion of discrimination based on his findings that are supported by substantial evidence.

---

5. HUD asserts in its brief that "even if HUD had attempted conciliation within 100 days of the filing of the complaint ... a successful outcome (other than a monetary settlement) was unlikely," since Baumgardner had rented the house by March or April to other tenants.

6. We express some reservation about admissibility of the opinion evidence of HOME's Ernestine Engstrand, but admission of this evidence was, at most, harmless error in our judgment.

## III. DAMAGES

### A. *General Considerations*

Title 42 U.S.C. § 3613 authorizes "actual and punitive damages" as well as injunctive relief. Baumgardner contends vigorously that the total amount of the award of compensatory damages was unsupported and unreasonable. We agree with this contention.

It is evident that under the statutory scheme prompt notice to the party charged is deemed important. This would afford a prompt opportunity to conciliate, negotiate, or bring about resolution of the claim or complaint without formal administrative proceedings or time consuming legal action. HUD's actions in this case were not only in some respects "frivolous," the agency also procrastinated and mismanaged the handling of Holley's complaint. HUD's actions were sloppy and dilatory, but it sought, nevertheless, to focus blame on Baumgardner as "uncooperative." In this close case on procedural due process, although we have sustained a liability determination, we must examine the damages issue carefully being mindful that a prompt chance to conciliate or to be alerted to the charge made by Holley may well have brought about a resolution of the controversy. We conclude that HUD's delay and handling did have an adverse impact on the question of damages.

### B. *Compensatory and Inconvenience Elements*

■ The ALJ awarded $2,000 "in compensation for his economic losses, including inconvenience." At the same time, there was an acknowledgement of "no attempt to present evidence of direct financial harm to the Complainant." Counsel for respondent and charging party at the hearing contended that Holley's "primary damages are loss of civil rights and emotional distress." The evidence is that plaintiff remained in his apartment, Cypress Apartments, for almost a year after the episode with Baumgardner despite making about twenty calls looking into other locations in the Walnut Hills and "surrounding neighborhoods." Holley's claim of inconvenience was based on his friends moving in with him after Holley was rejected at 2543 Victory Parkway. Holley conceded that he "chose to include" his friend at his apartment without compulsion. The "inconvenience" lasted a couple of months at most. Rental sought by Baumgardner was approximately $650.00 per month plus utility costs, considerably more than the $450.00 per month rental Holley was then paying for his apartment shared with a friend. Neither Holley nor his friends, after the initial unsuccessful contact, made any further attempt to contact Baumgardner to investigate further renting of the property in question. Holley conceded the episode "was kind of easy to get over" but for seeing the rental sign remain for a few weeks.

We find no basis for the ALJ's finding that there was economic loss *to Holley* because the rent for the house would not have been less than his apartment rent, or his share thereof, as found by the ALJ. It is immaterial what a third friend was paying for his separate apartment in our view. Holley is not entitled to recover for his friend's loss, if any, and none was demonstrated. He continued to live in the very near vicinity of 2543 Victory Parkway; he was, therefore, not denied neighborhood advantages nor location conveniences. It cost him no more to travel to work or to shop or wherever else he chose to go for necessities or enjoyment. Contrary to the ALJ's finding, it is *not* "clear that Complaint's *financial status* [was] affected." (Emphasis added).

There was also, as noted by the ALJ, no attempt "to break out what amount [was claimed] as compensation ... due to direct costs and inconvenience as opposed to emotional distress and loss of civil rights." Despite what we perceive to be a lack of proof to show any actual economic loss, the ALJ awarded $2,000 to Holley for "his economic losses, including inconvenience." We will reduce this award in accordance with the above rationale to $1,000, giving HUD and Holley the benefit of some con-

siderable doubt in this regard.[7] This would also cover any nominal financial loss, although not adequately proved.

## C. *Emotional Distress*

■ Next, the ALJ considered and discussed emotional distress. Citing *Gore v. Turner*, 563 F.2d 159 (5th Cir.1977), and *Parker v. Shonfeld*, 409 F.Supp. 876 (N.D.Calif.1976), as authority, the ALJ determined that "intangible damages suffered" could also be awarded in addition to "compensatory damages" and "inconvenience."[8] Both of these cases, however, involved discussion of allowable damages under 42 U.S.C. §§ 1981 and 1982 and neither specifically approved damages for emotional distress under the Fair Housing act. *Black v. R.H. Macy & Co., Inc.*, 712 F.2d 1241 (8th Cir.1983), later referred to in the emotional distress discussion, was a Title VII and § 1981 case, not a Fair Housing Act case. Holley did not appear to the ALJ to be "a man of vulnerable constitution who could be easily driven to distress." He felt hurt and angry, but "it was kind of easy to get over." The ALJ awarded Holley $500 for emotional distress. Once again, giving Holley the benefit of doubt, since this circuit has held heretofore in dicta that the Fair Housing Act encompasses an emotional distress component in a race discrimination context, *Stewart v. Furton*, 774 F.2d 706, 710 (6th Cir.1985), we AFFIRM this award. The amount allowed was not erroneous under all the circumstances. *See also Smith v. Anchor Bldg. Corp.*, 536 F.2d 231 (8th Cir.1976); *Phillips v. Hunter Trials Comm. Ass'n*, 685 F.2d 184 (7th Cir.1982). The contention that in an entirely different episode, not connected with Baumgardner in any way,

Holley may have experienced racial discrimination and that this experience should augment the damages here is meritless.

## D. *Loss of Civil Rights*

■ The government argues in its brief that the additional $2,500 designated as compensatory damages by the ALJ was apparently based on "compensation for actual injury, not on the abstract value of civil rights." There may be some "presumed" intangible injury from a violation of the Fair Housing Act by reason of illegal discrimination, but we have never decided that a single act of gender discrimination triggers presumed damages for a decisionmaker's opinion about "importance of civil rights as an abstract matter." *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 308, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986). The $2,500 award for loss of civil rights made by the ALJ was "a means of showing that the loss of civil rights is a serious matter." He also made brief mention in respect to this award of the taking away of choice as to where Holley would live. We do not agree with the government that the ALJ intended this to be anything but an added award for an intangible injury not in the nature of proven compensatory damages.

Amicus curiae and the government call our attention to a recent unpublished case, *Woods v. Beavers*, 922 F.2d 842 (6th Cir. 1991), with respect to this question. *Woods* involved a combination of § 1981, § 1982 and Fair Housing Act claims and also involved a jury trial. We cannot tell which act the contested jury instruction involved. The panel in *Woods* seemed to

---

**7.** In a Fair Housing Act case involving racial discrimination, attributable essentially to a "badge of slavery" stigmatizing act, the total damages allowed, including recompense, humiliation, and damages "to ease one's feeling," was $1000. *See Steele v. Title Realty Co.*, 478 F.2d 380 (10th Cir.1973). In a somewhat comparable case involving refusal to rent under 42 U.S.C. § 1982, the circuit court reversed a district court decision and remanded for a total damage award not to exceed $1000. *Smith v. Adler Realty Co.*, 436 F.2d 344 (7th Cir.1971). In another case with allegations under both § 1982 and the Fair Housing Act of refusal to rent, the

total damage award allowed, including "humiliation," was $500. *Seaton v. Sky Realty Co.*, 491 F.2d 634 (7th Cir.1974). We do not intimate, however, that $1,000 is a limit upon such damages.

**8.** We deem the "inconvenience" award to be an "intangible damage" benefit. We consider a separate claim for "emotional distress" as additional intangible damages to be questionable, but we affirm the award resolving doubt in Holley's favor.

indicate that Fair Housing Act injury may be "impossible to measure" under *Stachura* standards, but, nevertheless, is compensable even absent "physical or mental injuries." *Woods*, slip op. at 8. The thrust of the decision, however, involved a punitive damages award and whether certain testimony was admissible. We find *Woods* not to be controlling under the circumstances here. Amicus curiae urge that *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1981), to which *Woods* made reference by a footnote, holds that a Fair Housing Act violation *per se* establishes compensable injury. *Havens Realty* involved a showing by plaintiffs of a "distinct and palpable injury," *id.* at 372, 102 S.Ct. at 1120–21, and the real issue discussed was whether certain plaintiffs had standing and retained standing. There was, however, no award of damages for mere violation of a civil right, as such, in that case.

*Stachura* discusses damages allowable in a case of a constitutional tort, and first noted that damages in such a case are "ordinarily determined according to principles derived from the common law of torts." 477 U.S. at 306, 106 S.Ct. at 2543. It added that "compensatory damages may include not only out-of-pocket loss and other monetary harms, but also ... 'impairment of reputation ... personal humiliation, and mental anguish.'" *Id.* at 307, 106 S.Ct. at 2543, *quoting Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The latter components also include "emotional distress." *Id.* 477 U.S. at 307, 106 S.Ct. at 2543. *Stachura* held specifically that a trier of fact may not also include as damages "subjective perception of the importance of constitutional rights as an abstract matter." *Id.* at 308, 106 S.Ct. at 2543. The ALJ, by allowing $2500 in damages for his subjective perception that violation of this Fair Housing Act was a "serious matter" was in error. *See Carey v. Piphus*, 435 U.S. 247, 255, 98 S.Ct. 1042, 1047–48, 55 L.Ed.2d 252 (1978) ("damages are available [for violations of constitutional rights that] *'have caused compensable injury....'"*) (emphasis in original) (quoting from *Wood v. Strickland*, 420 U.S. 308, 319, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975). *Piphus* recognized that proven "mental and emotional distress" caused by a constitutional violation is compensable. *Id.* 435 U.S. at 264, 98 S.Ct. at 1052–53; *cf. Seaton v. Sky Realty Co.*, 491 F.2d 634 (7th Cir.1974) (permitting damages of $500 for "humiliation and distress"); *Basista v. Weir*, 340 F.2d 74 (3d Cir.1965) (nominal award was made for such damages but not for loss of civil rights as such). *Stachura* disapproved the concept of abstract "noncompensatory" damages as "unnecessary to vindicate ... constitutional rights." *Id.* 477 U.S. at 309, 310, 106 S.Ct. at 2544, 2544–45.

This is not a case for a substitution for compensatory damages (such as presumed damages in a defamation case). Here, we have approved two different areas of compensatory damages for the inconvenience, emotional distress, and hurt suffered by Holley. The damages allowed have taken into account recompense for "intangible 'dignitary interests'" discussed in *Brandon v. Allen*, 719 F.2d 151 (6th Cir.1983), *rev'd on other grounds sub nom. Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1984). We have allowed elements of damages which are difficult to measure in order to compensate Holley for the single violation in this case of the Fair Housing Act. The damages totalling $1500 do "roughly approximate the harm that the [charging party] suffered and compensate for harms impossible to measure" as stated in *Stachura* and reiterated in *Pembaur v. City of Cincinnati*, 882 F.2d 1101, 1104 (6th Cir.1989) ("damages for pain and suffering, mental anguish and the like are available"). *See also Walje v. City of Winchester*, 827 F.2d 10, 13 (6th Cir.1987) ("The *Stachura* Court admonished us that the proper focus of damage awards for constitutional torts should be compensatory and that it is proper to look to common law principles ... where specific damages are difficult to establish.")[9]

9. Walje was unconstitutionally suspended from his job when his wife was 8½ months pregnant;

■ In reaching our decision under the facts of this case on the issue of emotional distress and inconvenience, we do not preclude an award of presumed damages in civil rights claims in all events but in cases where plaintiff fails to prove an actual injury. While a trier may not award damages for perceived "subjective perception of the importance of constitutional rights as an abstract matter," it may be in particular situations that "some form of presumed damages may *possibly* be appropriate." *Stachura,* 477 U.S. at 308, 311 n. 14, 106 S.Ct. at 2543, 2545 n. 14 (emphasis added). There is no need on the facts of this case to *presume* any added damages.

In sum, we will set aside the award of damages of $2500 for loss of civil rights on the basis asserted by the ALJ because it is an unwarranted, subjective, additional assessment beyond the proper measure of compensatory damages proven in this case. We have presumed some damages for intangible dignitary interests of Holley, and have allowed for his inconvenience, emotional distress, hurt, and mental anguish in the total amount of $1500 for compensatory damages.

### E. *Civil Penalty—Punitive Damages*

■ Because Baumgardner had been in the real estate business renting houses for eight years, "expressed his preference not to rent to the Complaint on the basis of his sex," and misrepresented removing the house in question from the rental market (although he previously had done this and later used it for his office), the ALJ imposed a punitive award against Baumgardner. The ALJ conceded that this was a single offense, and that there was no other evidence of discriminatory conduct on Baumgardner's part. He rented generally to males and to females and to blacks and to whites in his rental units. He had previously experienced major damage to the house in question by single male tenants.

We have heretofore recited that HUD's mismanagement of the complaint adversely

affected Baumgardner's ability to negotiate or conciliate his refusal to permit Holley to inspect the house and denied him of an opportunity to work out a rental arrangement for Holley and his friends. This was clearly not a case of "egregious racial discrimination" as in *Secretary HUD v. Blackwell,* 908 F.2d 864 (11th Cir.1990), referred to by the ALJ, in which the statutory maximum civil penalty of $10,000 was assessed in addition to nearly $45,000 in proven compensatory damages. We entertain a clear conviction in this case, based upon all the circumstances in the record, that an award in excess of the allowed compensatory damages of $1500 for a civil penalty would be excessive, unjust, and improper. We, therefore, adjust the civil penalty damage award to $1500. Total damages, therefore, are determined to be $3000.

### IV. INJUNCTIVE RELIEF

Attached to our opinion as an exhibit is the injunctive order entered by the ALJ in this case. (J/A 54 and 55).

■ Paragraph one constitutes a permanent injunction against Baumgardner prescribing future discrimination against Holley or his family members "because of race, color or sex" and from retaliating against him. We AFFIRM this injunction with the exception that we eliminate therefrom the words "race and color." There is no claim, nor any showing, in this case of discrimination by reason of race or color and this is an unwarranted (and unnecessary) addition to the otherwise acceptable language. We also make it clear that paragraph two should not be read to impose any special requirement upon Baumgardner, beyond the requirements of law, as to anyone renting real estate to keep records relating to race or color.

As to paragraph three, we amend the injunction so as to require submission of copies of *written* rental applications only to HUD for quarterly periods beginning Janu-

---

feared that his health insurance was jeopardized; was under severe emotional pressure;

and "felt close to a nervous breakdown."

ary 1, 1991 through December 1993. As to oral applications, Baumgardner will be required to keep and maintain for two years adequate records of the sex of oral applicants and persons who inquire orally about availability of rental units; the applicable dates; whether or not accepted; and the reason for rejection, if rejected.

Baumgardner shall also be required during said period to keep and maintain a list of occupants and vacancies with the gender noted of departed tenants, the dates of departure, when next rented, and the gender of the new tenants. We approve the requirement that Baumgardner furnish to HUD, together with copies of written rental applications during this period, copies of advertisements as reflected in paragraph 3(d). Baumgardner shall also furnish HUD with sample or representative leases and changes or amendments thereto made during this two year period.

We approve the provisions of paragraph four except, necessarily, reference is to the order, as amended by this opinion. Paragraphs five and six are amended to provide for payment, in each instance of $1500, a total of $3000, within forty-five days after this opinion becomes final.

With respect to paragraph seven, Baumgardner is directed to report in writing to HUD the steps taken to comply with the provisions of this opinion, within thirty days after it becomes final.

In summary, we AFFIRM the ALJ's finding of liability. We REVERSE the awards of damages, and award instead $1500 in compensatory damages and $1500 in civil penalty, a total of $3000. We AMEND the injunctive order of relief as herein indicated.

## APPENDIX

ORDERED that,

1. Respondent is permanently enjoined from discriminating against Complainant, Blanton Holley, or any member of his family, with respect to housing, because of race, color, or sex, and from retaliating against or otherwise harassing Complainant or any member of his family. Prohibit-ed actions include, but are not limited to, all those enumerated in the regulations codified at 24 CFR Part 100 (1989).

2. Respondent shall institute record-keeping of the operation of his rental properties which are adequate to comply with the requirements set forth in this Order, including keeping all records described in paragraph 4 of this Order. Respondent shall permit representatives of HUD to inspect and copy all pertinent records at reasonable times after reasonable notice.

3. On the last day of every third month beginning March 31, 1991, and continuing for three years, Respondent shall submit reports containing the following information regarding the previous three months, for all properties owned or otherwise controlled by Respondent, to HUD's Chicago Regional Office of Fair Housing and Equal Opportunity, 626 West Jackson Blvd., Chicago, Illinois 60606–5601, provided that the director of that office may modify this paragraph of this Order, as deemed necessary to make its requirements less, but not more, burdensome:

a. a duplicate of every written application, and written description of every oral application, for all persons who applied for occupancy of all such Respondent's property, including a statement of the person's sex, whether the person was rejected or accepted, the date of such action, and, if rejected, the reason for the rejection;

b. a list of vacancies at all such Respondent's properties including the departed tenant's sex, the date of termination notification, the date moved out, the date the unit was next committed to rental, the sex of the new tenant, and the date that the new tenant moves in;

c. current occupancy statistics indicating which of the Respondent's properties are occupied by males or groups including males;

d. sample copies of advertisements published or posted during the reporting period, including dates and what, if any, media was used, or a statement that no advertising was conducted;

e. a list of all persons who inquired in any manner about renting one of Respondent's units, including their names, addresses, sexes, and the dates and dispositions of their inquiries; and

f. a description of any rules, regulations, leases, or other documents, or changes thereto, provided to or signed by any tenants or applicants.

4. Respondent shall inform all his agents and employees, including resident managers, of the terms this Order and shall educate them as to these terms and the requirements of the Fair Housing Act.

5. Within forty-five days of the date on which this Initial Decision and Order is issued, Respondent shall pay damages in the amount of $5,000.00 to Complainant to compensate him for the losses that resulted from Respondent's discriminatory activity.

6. Within forty-five days of the date that this Initial Decision and Order becomes final, Respondent shall pay a civil penalty of $4,000.00 to the Secretary, United States Department of Housing and Urban Development.

7. Within fifteen days of the date that this Order becomes final, Respondent shall submit a report to HUD's Chicago Regional Office of Fair Housing and Equal Opportunity that sets forth the steps he has taken to comply with the other provisions of this Order.

Robert A. Andretta
Administrative Law Judge

Dated: November 15, 1990.

NATHANIEL R. JONES, Circuit Judge, concurring.

While I concur fully in the majority's opinion, I write separately to reenforce the majority's observation that presumed damages may be appropriate for civil rights violations, including those arising under the Fair Housing Act, 42 U.S.C. §§ 3601–3631 (1988) (the "Act"), and to note that the amount of damages awarded by the administrative law judge ("ALJ"), while perhaps not supported by the evidence in this case, was well within the range normally awarded for violations of the Act.

Recent Supreme Court precedent has left untouched a court's ability to award presumed damages for civil rights violations in the absence of evidence of tangible injury. In *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), for instance, defendants appealed the lower court's ruling that plaintiffs would be entitled to "substantial" damages for violation of their Fourteenth Amendment right to procedural due process even if the trial court found that the ultimate adverse action taken against plaintiffs was justified. *Id.* at 252–53, 98 S.Ct. at 1046–47. In holding that such a finding would entitle plaintiffs to only nominal damages, the Court reasoned that, if defendants' adverse action was indeed justified, it would be inappropriate to presume that plaintiffs had suffered an actual, compensable injury. *Id.* at 263, 98 S.Ct. at 1052. However, the Court was careful to note that its analysis did not transfer automatically to all deprivations of constitutional rights:

[T]he elements and prerequisites for recovery of damages appropriate to compensate injuries caused by the deprivation of one constitutional right are not necessarily appropriate to compensate injuries caused by the deprivation of another. As we have said, these issues must be considered with reference to the nature of the interests protected by the particular constitutional right in question.

*Id.* at 264–65, 98 S.Ct. at 1053 (citation omitted); *see also Brandon v. Allen*, 719 F.2d 151, 154–55 (6th Cir.1983), *rev'd on other grounds*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985).

The Court's more recent disposition in *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), likewise does not foreclose an award for presumed damages under the Act. In *Stachura*, the Court reversed an award under § 1983 on plaintiff's claim that defendants violated his rights under the First Amendment, where *in addition* to compensatory and punitive dam-

ages, the court instructed the jury that it could award plaintiff the value of the right in the abstract:

> "The precise value you place upon any Constitutional right which you find was denied to Plaintiff is within your discretion. You may wish to consider the importance of the right in our system of government, the role which this right has played in the history of our republic, [and] the significance of the right in the context of the activities which the Plaintiff was engaged in at the time of the violation of the right."

*Id.* at 303, 106 S.Ct. at 2540 (quoting J.A. at 94). The Court objected to the instruction on the ground that it permitted an award merely on the basis of "the jury's subjective perception of the importance of constitutional rights as an abstract matter." *Id.* at 308, 106 S.Ct. at 2543. The Court noted, however, that "[w]hen a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish, some form of presumed damages may possibly be appropriate." *See id.* at 310–11, 106 S.Ct. at 2544–45. Indeed, the Court reaffirmed the appropriateness of presumed damages in cases involving, for instance, the right to vote, on the ground that the right " 'is so valuable that damages are presumed from the wrongful deprivation of it without evidence of actual loss of money, property, or any other valuable thing.' " *Id.* at 311 n. 14, 106 S.Ct. at 2545 n. 14 (quoting *Wayne v. Venable,* 260 F. 64, 66 (8th Cir.1919)).

This court has repeatedly recognized that neither *Carey* nor *Stachura* forecloses an award of presumed damages for civil rights violations in appropriate circumstances. Thus, in *Brandon,* we held that *Carey* did not preclude an award under § 1983 for presumed damages flowing from a police officer's unconstitutional assault on plaintiff. *Brandon,* 719 F.2d at 155. More recently, in *Pembaur v. City of Cincinnati,* 882 F.2d 1101 (6th Cir.1989), we held that *Stachura* did not prohibit the award of presumed damages for a civil rights action brought under § 1983. *See id.* at 1104; *see also Walje v. City of Winchester,* 827 F.2d 10, 13 (6th Cir.1987)

(holding that general damages may be appropriate for violation of First Amendment right to free speech brought under § 1983).

In the instant case, Holley presented evidence of, and was awarded damages for, the actual injury he suffered as a result of Baumgardner's discriminatory refusal to rent the subject dwelling on the basis of Holley's sex. Therefore, I agree with the majority that there was no need on the facts of this case to "presume" damages. *See Stachura,* 477 U.S. at 310, 106 S.Ct. at 2545 ("Presumed damages are a *substitute* for ordinary compensatory damages, not a *supplement* for an award that fully compensates the alleged injury."). I also agree that the ALJ's allowance of the award "as a means of showing that the loss of civil rights is a serious matter and will not be disregarded by this forum," J.A. at 52, while laudable in its intent, treads perhaps too closely to the "abstract" award found objectionable in *Stachura.* Nevertheless, had Holley been unable to come forth with direct evidence of compensable injury, he would not have been limited to merely nominal damages, but rather would have been entitled to seek presumed damages.

Finally, although I agree that the evidence presented by Holley was too sparse to support the damages awarded by the ALJ, this conclusion should not be read as implying that an award of $1,500 in any sense constitutes an upper limit of compensation for violations of the Act. A survey of recent cases from our circuit unequivocally establishes that awards in excess of the amount awarded by the ALJ in this case are often warranted. *See, e.g., Green v. Century 21,* 740 F.2d 460, 462, 465 (6th Cir.1984) (upholding award of $30,000 against one defendant and $11,000 against another for racial discrimination in violation of the Act); *Stewart v. Crosson,* 1 Fair Housing–Fair Lending Cases (P–H) ¶ 15,-596, at 1019, 1019 (D.Tenn.1988) (awarding $6,000 in damages to mother and daughter for discomfort resulting from inferior housing); *Pollitt v. Bramel,* 669 F.Supp. 172, 177 (S.D.Ohio 1987) (awarding $25,000 to couple denied housing on the basis of race in violation of the Act); *Shaw v. Cassar,*

558 F.Supp. 303, 315 (E.D.Mich.1983) (awarding $20,000 to couple denied housing on the basis of race in violation of the Act). Therefore, had Holley presented more probative evidence regarding the extent of his injury, economic and otherwise, it would certainly have been well within the ALJ's discretion to compensate Holley in amount equal to and even in excess of the amount awarded in this case.