Michael P. **KELLY** and John T. **Kelly,** Petitioners,

v.

The **SECRETARY, UNITED STATES DE-PARTMENT OF HOUSING AND UR-BAN DEVELOPMENT** and Dionne Staples, Respondents.

No. 92–4064.

United States Court of Appeals, Sixth Circuit.

Argued July 1, 1993.

Decided Aug. 27, 1993.

Rehearing Denied Oct. 28, 1993.

---

Robert G. Kelly (argued & briefed), Norwood, OH, for petitioners.

William R. Yeomans (argued & briefed), U.S. Dept. of Justice, Civil Rights Div., Appellate Section, Washington, DC, Konrad J. Rayford, Office of U.S. Dept. of Housing and Urban Development, Chicago, IL, for respondent Secretary.

Frederick M. Morgan, Jr. (argued & briefed), Cincinnati, OH, for respondent Dionne Staples.

Before: MILBURN and NORRIS, Circuit Judges; and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

■ This is a petition to review the final decision of an administrative law judge (ALJ) under the Fair Housing Amendments Act of 1988 (the Act), 42 U.S.C. § 3601, et seq. (1988). We have jurisdiction under § 3612(i). The ALJ found that the petitioners, Michael P. Kelly and John T. Kelly, violated the Act by refusing to rent an apartment owned by the Kellys because the applicant had two children. Such a refusal on the basis of "familial status" is unlawful discrimination under the prohibitions contained in § 3604. The ALJ awarded damages to the complainant, and enjoined future discrimination. See § 3612(g)(3).

Upon consideration of the record together with the briefs and oral arguments of counsel, we affirm the finding of unlawful discrimination and the injunction, vacate the award of damages and remand for further proceedings.

## I.

### A.

The record supports the ALJ's factual findings, which we outline below.

Dionne Staples is a single mother of twin daughters who were five years old in March 1990. In late 1989 and early 1990, Ms. Staples and her children were living with her parents in very crowded conditions. These conditions led Ms. Staples to look for an apartment. She had difficulty finding one because of her low income. In early March she spotted a sign in front of a 31–unit apartment complex at 6300 Montgomery Road in Cincinnati, Ohio, which stated that a two-bedroom apartment was available. Ms. Staples called the posted phone number on March 5th and spoke with an unidentified man. After preliminary discussions, the man asked who would be occupying the apartment. Ms. Staples explained that her two daughters would be living with her. The man then replied that she had one too many daughters and that "we only allow one child per bedroom." Approximately a month and a half later, Ms. Staples rented another apartment at Kenwood Towers that was not as convenient as the apartment on Montgomery Road. Among the advantages of the Montgomery Road apartment were that it was near Ms. Staples' friends and family, a direct bus to her job stopped at the complex, and it was close to a drug store, grocery store, library, and parks. Kenwood Towers is not convenient to public transportation or shopping.

The apartment complex on Montgomery Road is owned by petitioners Michael Kelly and John Kelly, who are brothers, and the wife of their brother James, Kathie Kelly. It was Michael Kelly's "turn" to fill the vacancy in March 1990. The telephone number that Ms. Staples called on March 5th to inquire about the vacant apartment was the number of Michael Kelly's business, Michael P. Kelly Realty. The disputed apartment was ultimately rented to a couple without children on March 17, 1990.

After Ms. Staples was unable to rent the Kelly apartment, she called H.O.M.E., Inc., a non-profit fair housing organization. H.O.M.E. conducted an investigation using several testers who posed as prospective renters. One tester, Kathleen Lester, testified she went to the apartment building and met with Michael Kelly to discuss renting an apartment. Ms. Lester testified that when she told Michael Kelly that she had two elementary school children he "abruptly folded his arms and his eyes went towards the ceiling and he didn't say anything, but his expression on his face changed." Another tester, Adonica Jones, telephoned Michael P. Kelly Realty to inquire about an apartment that was for rent. She spoke to an unidentified woman who asked her if she was married and whether she had children. The unidentified woman explained that "she had to know because the owner only allowed one child in the apartment."

## B.

Ms. Staples filed her complaint with HUD on May 17, 1990, alleging that she had been denied an apartment because of her race and familial status in violation of the Act. HUD sent copies of the complaint to the Kellys, but only Michael received the complaint because HUD used an incorrect address for John. However, Michael did notify John of the complaint. HUD received a response on June 5, 1990, and the parties attended a conciliation meeting on July 19, 1990. The complaint was amended in late July 1990, deleting the racial discrimination claim. The complaint was amended a second time in November 1990, adding James Kelly, but HUD later dropped James Kelly as a respondent. HUD's investigator, Charles Jung, completed his investigation on October 2, 1990. HUD did not issue its Reasonable Cause Determination and Charge of Discrimination until March 2, 1992.

The ALJ held an oral hearing on May 27, 28, and 29, 1992. The ALJ concluded that the Kellys had violated the Act. He stated that "a preponderance of the evidence shows that Michael Kelly, or agents under his direction and control, intentionally engaged in conduct that made a two-bedroom apartment unavailable to Complainant and her two daughters because of their familial status." John Kelly was also found liable by virtue of his joint ownership of the complex.

While acknowledging several procedural errors committed by HUD, the ALJ held that respondents "did not demonstrate how they suffered any substantial prejudice in the preparation or presentation of their defense as a result of HUD's failure to follow its own rules or regulations." The ALJ awarded a total of $10,430.76 in damages to Ms. Staples. The ALJ refused to award damages for future loss. Because of HUD's delay in bringing the case to adjudication, the ALJ refused to order a civil penalty. The ALJ also entered an injunction, which in part required the Kellys to refrain from discriminating, to keep records, and to make regular reports to HUD.

## II.

We summarize the parties arguments on appeal.

### A.

Aside from their contention that the ALJ's finding of unlawful discrimination is not supported by substantial evidence, the petitioners' principal ground for reversal lies in their claim that the Secretary violated procedural requirements of the Act and of HUD's own regulations to such an extreme degree as to deny them due process of law.

The petitioners argue first that the Secretary violated 42 U.S.C. § 3610(a)(1)(B)(ii) and 24 C.F.R. § 103.50 (1992), which provide that the Secretary is to serve the named respondent with notice of the alleged discriminatory housing practices, provide a copy of the complaint, and advise the respondent of his procedural rights and obligations within ten days after the filing of the complaint. Petitioners contend that John Kelly was not served with a copy of the initial complaint or the first amended complaint and was not provided information about his procedural rights.

The petitioners also assert that the Secretary failed to follow §§ 3610(a)(1)(B)(iv) & (a)(1)(C). Section 3610(a)(1)(B)(iv) states

that "the Secretary shall make an investigation of the alleged discriminatory housing practice and complete such investigation within 100 days after the filing of the complaint ... unless it is impracticable to do so." And § 3610(a)(1)(C) provides that "[i]f the Secretary is unable to complete the investigation within 100 days after the filing of the complaint ... the Secretary shall notify the complainant and respondent in writing of the reasons for not doing so." See also 24 C.F.R. § 103.225 (1992).

The petitioners next point out that the Secretary did not comply with § 3610(g)(1):

> The Secretary shall, within 100 days after the filing of the complaint ... determine based on the facts whether reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, unless it is impracticable to do so, or unless the Secretary has approved a conciliation agreement with respect to the complaint. If the Secretary is unable to make the determination within 100 days after the filing of the complaint ... the Secretary shall notify the complainant and respondent in writing of the reasons for not doing so.

See also 24 C.F.R. § 103.400 (1992).

Finally, the petitioners contend that they were denied an objectively reasonable investigation and conciliation. They claim that Jung, the investigator, was so biased in the investigation and at the conciliation meeting that they could not receive a reasonable conciliation, as required by the Act.

The petitioners also complain of the ALJ's rulings respecting answers to interrogatories, other discovery requests and requests for subpoenas to HUD officials and a HUD attorney. We find no abuse of discretion in the ALJ's rulings and will not discuss these matters further.

### B.

The Secretary argues that *Baumgardner v. Secretary, HUD,* 960 F.2d 572 (6th Cir. 1992), requires that any procedural errors committed by HUD be shown to prejudice petitioners substantially to warrant dismissal. The Secretary maintains that the Kellys have shown no prejudice. As to the service of the complaint, the Secretary explains that while it was unclear whether HUD technically complied with the time-limit, it does not matter, because John Kelly received actual notice from his brother Michael and John helped prepare the response to the complaint. We agree with this finding; John Kelly was not prejudiced by this particular oversight by HUD. The Secretary then addresses the time limit requirements. The Secretary admits that § 3610(a)(1)(B)(iv) and § 3610(g)(1) were not followed. The Secretary concedes that neither time limit was followed and that petitioners were not notified of this noncompliance. Again, the Secretary argues that the noncompliance is not in of itself enough to warrant dismissal. The Secretary claims that the petitioners must show that they were substantially prejudiced by the delay and the failure of notice. The Secretary relies upon the fact that the petitioners do not contend that their ability to contest the charge was impaired in any way by these omissions. The Secretary also states that the procedural errors complained of in this case were less prejudicial than those in *Baumgardner.*

Finally, the Secretary asserts that the conciliation efforts in the present case exceeded the efforts in *Baumgardner.* In *Baumgardner* this court found a single phone contact and an unsuccessful meeting "barely sufficient." *Baumgardner,* 960 F.2d at 579. The Secretary points out that there was a conciliation meeting on July 19, 1990, and after the second complaint was served, HUD offered further conciliation. The Secretary states that petitioners simply chose not to participate in conciliation.

### III.

We are surprised and distressed to have another Fair Housing Act case from Cincinnati in which HUD has ignored time requirements and generally displayed a cavalier attitude toward the rights of parties against whom it brings charges. In *Baumgardner,* we found that HUD's actions were not only "frivolous" in some respects but also involved procrastination and mismanagement of the would-be renter's complaint. We further

characterized HUD's actions as "sloppy and dilatory." 960 F.2d at 580. Although we concluded that these procedural errors did not reach the level of a due process violation, we drastically reduced the ALJ's award of damages because of these transgressions. Apparently the Cincinnati office of HUD just doesn't get it.

### A.

One of the most troublesome features of the present case is that the very investigator, Charles Jung, who mishandled the *Baumgardner* complaint and investigation occupied the same role in the complaint against the Kellys. The petitioners argue forcefully that Jung displayed such bias and disregard for their rights that they were prejudiced to the point of having no meaningful opportunity to settle Ms. Staples' complaint by conciliation.

The ALJ attempted to minimize Jung's influence on his final decision by stating in a footnote that "none of the liability findings in this decision depend on the credibility of HUD's investigator." This disclaimer does not reach one of the most disquieting features of HUD's performance in this case. Because of Jung's role, the conciliation efforts were seriously flawed.

HUD's regulations provide: "Generally, officers, employees, and agents of HUD engaged in the investigation of a complaint under this part will not participate or advise in the conciliation of the same complaint or in any factually related complaint." 24 C.F.R. § 103.300(c). Jung was both the investigator and conciliator. In *Baumgardner* this court stated that § 3610(b)(1)'s requirement that "the Secretary shall, to the extent feasible, engage in conciliation with respect to such complaint" means that the respondent "is entitled to an objectively reasonable effort by the agency to bring about a settlement of the charge." *Baumgardner*, 960 F.2d at 579. One of the petitioners' strongest objections to HUD's treatment of them was based on their perception that Jung was not interested in their side of the case. One of the petitioners testified that Jung made no effort to investigate the petitioners' assertion that there was no basis for a racial discrimination complaint. Jung did not pursue evidence offered by the petitioners that numerous African-American families rented at 6300 Montgomery Road and continued to include a charge of racial discrimination long after even a cursory investigation would have proven it baseless. Yet, when the petitioners attended a conciliation meeting they were confronted with investigator Jung as HUD's conciliator. Furthermore, § 3610(b)(1) states that conciliation should take place until "the filing of a charge or a dismissal by the Secretary...." The record reveals that Jung made no contact with the petitioners concerning conciliation between the completion of the investigation in October 1990 and the issuance of the charge in March 1992.

It is also clear that after the July conciliation meeting, Jung offered further conciliation in a cursory fashion. This was in the form of suggesting to the Kellys that they "reconsider resolution" at the end of the cover letter accompanying the first amended complaint. In addition, Jung admitted in his testimony that he did no investigation before the conciliation. Petitioners' attorney asked Jung: "Now, will you agree with me that you did nothing to investigate the race portion of Ms. Staples' complaint between the time you received it and 7/19/90 [the conciliation meeting date]?" Jung answered: "I would say you're right." Petitioners' attorney then asked: "And you'll agree with me that we're talking up to conciliation, from conciliation until 7/27/90 you'll agree that you didn't do anything to investigate it?" Jung answered: "Correct."

In view of Jung's unwarranted procrastination in processing the complaint and attempting to bring it to a satisfactory conclusion and the obvious antagonism that had developed between him and the petitioners, he should not have acted as conciliator in this case. With him in that role, HUD did not make "an objectively reasonable effort ... to bring about a settlement of the charge." *Baumgardner*, 960 F.2d at 579.

### B.

In his decision in this case, the ALJ described the purpose of providing for adminis-

trative adjudication of housing discrimination complaints as follows:

> When Congress authorized administrative adjudication in 1988, it intended to provide a "speedy, fair, and inexpensive" procedure for resolving housing discrimination complaints. Toward that end, the Act contains numerous time limitations. For example, HUD is required to complete its investigation and issue a reasonable cause determination within 100 days of the filing of the complaint; an administrative hearing must begin no later than 120 days after the issuance of a charge of discrimination; the decision of the administrative law judge is to be issued within 60 days after the end of the hearing; and the Secretary's discretionary review must be completed not later than 30 days after issuance of the decision. Taken together, these time limitations indicate that Congress expected that a housing discrimination complaint brought before an administrative law judge would reach completion within less than a year after the filing of the complaint with HUD. (footnotes omitted).

The ALJ then concluded:

> However, almost exactly two years elapsed from the date Complainant telephoned H.O.M.E. to complain that she was a victim of housing discrimination until the date HUD issued its Reasonable Cause Determination and Charge of Discrimination. By the time this decision becomes final, at least two and one-half years will have passed. There is no justification in the record for this delay, particularly the 17–month period between October 2, 1990, when HUD's investigator completed his investigation, and March 2, 1992, when the Reasonable Cause Determination and Charge of Discrimination was issued. Clearly, in the instant case the parties have not been afforded the speedy resolution of the complaint required by the Act. (citation omitted).

### C.

Despite these findings of clear and unexplained violations of provisions of the Act intended to avoid delay and undue expense,

the ALJ concluded that the Kellys did not suffer a due process violation. This determination was based primarily upon the fact that the petitioners could demonstrate no prejudice from the delays. It is true that the delays do not appear to have prejudiced the petitioners' ability to defend against the charge of a violation. Thus, we agree with the ALJ to the extent he concluded that his liability determination was not affected by the delays. The ALJ recognized, however, that the delay did increase Ms. Staples' claim for damages, and attempted to take this into account by declining to assess a civil penalty.

We also agree with the ALJ's conclusion that the City of Cincinnati Building Code requirement that an apartment occupied by three persons must have a total living space of at least 350 square feet provides no defense. The Code states that a room occupied on a regular basis by two persons for sleeping purposes must have an area of at least 100 square feet. The apartment that Ms. Staples wanted to rent has a total of 503 square feet, and the larger bedroom has an area of 145 square feet. The petitioners' assumption that the adult would occupy the larger bedroom, leaving the two children crowded into the smaller (70 square feet) bedroom is entirely speculative. No one even asked Ms. Staples how the space would be used if she were given an opportunity to live in the apartment.

The ALJ never got to the heart of the petitioners' assertion that they were afforded no objectively reasonable effort to settle this claim by conciliation. The fact that a conciliation meeting was held, with Jung as conciliator, and that another was proposed without a change in conciliator does not answer the Kellys' objections to this procedural error.

One thing further needs to be said about the ALJ's treatment of the petitioners' objections to the conciliation process. Section 3610(d)(1) prohibits making public or using as evidence in subsequent proceedings anything said or done during a conciliation without the written consent of the persons concerned. This confidentiality provision prevents disclosure of offers, submissions, concessions and similar negotiating efforts dur-

ing conciliation, but it does not preclude an examination of the conciliation process itself.

## IV.

### A.

The Fair Housing Amendments Act of 1988 made several significant changes in the procedures followed under the original Fair Housing Act. Probably the most important of these was the creation of an administrative enforcement mechanism. Under the original Act HUD had no enforcement authority; it could use only informal methods of persuasion and conciliation, with no power to sue violators, as in other civil rights laws. In his message to Congress transmitting the Proposed Fair Housing Amendments Act of 1988, President Reagan wrote:

Since its passage, however, a consensus has developed that the Fair Housing Act has delivered short of its promise because of a gap in its enforcement mechanism.

The gap in enforcement is the lack of a forceful back-up mechanism which provides an incentive to bring the parties to the conciliation table with serious intent to resolve the dispute then and there. When conciliation fails, the Secretary has no place else to go. In those few cases where good will is absent, the exclusive reliance upon voluntary resolution is, in the words of former Secretary Carla Hills, and [sic] 'invitation to intransigence.'

Reform of the Fair Housing Act is a necessity that is acknowledged by all.

Quoted in H.R.REP. No. 100-711, *reprinted in* 1988 U.S.Code Cong. & Adm.News, 2d Sess., 2173, 2177-78 (footnote omitted).

With respect to the 100 day limit for completing the investigation of a complaint, the House Report stated:

The Secretary will investigate the complaint following its filing and will complete the investigation within a 100 day period, unless it is impracticable to do so. The Committee intends that *in these exceptional cases* the investigation must be completed as soon as possible thereafter. If the Secretary cannot complete the investigation within 100 days, then the Secretary is required to notify the parties and explain the reasons for the delay.

*Id.* at 2194-95 (italics added).

Concerning the importance of conciliation, the Report stated:

The Committee intends for conciliation to remain a primary feature of fair housing enforcement. Resolving a complaint in the early stages of the process benefits all parties. Unlike current law, however, under the bill, if conciliation fails, then HUD can continue to enforce the law through the administrative process.

*Id.* at 2195.

### B.

■ We understand, of course, that the principal purpose of both the original and amended Acts is to vindicate the rights of persons who suffer discrimination in housing. Nevertheless, those against whom complaints are made are entitled to fair treatment as well. Of course, we do not want to penalize the complainant for HUD's errors. Nevertheless, we must exercise a balance that clearly has been lacking in this case.

The record offers no explanation for the procedural lapses that occurred in this case. This was not an exceptional case. It involved a single complaint that should have been resolved either by conciliation or enforcement well within the statutory time limits. The delays were inexcusable and the failure to follow the general requirement that an investigator not be involved in conciliation of a complaint he has processed nullified any real possibility of resolving it by conciliation.

While we agree with the ALJ that the petitioners were not prejudiced by the delays insofar as the finding of a violation is concerned, we believe the parties should be given an opportunity to resolve this matter by means of a fair and reasonable conciliation effort. Otherwise, the Act's laudable goal of keeping conciliation as "a primary feature of fair housing enforcement" will be thwarted. Accordingly, we vacate the award of damages and remand to HUD for the purpose of conducting conciliation with a qualified conciliator other than Charles Jung, who has had no previous contact with this case. If concili-

ation fails, the case will be returned to the ALJ for reconsideration and such further proceedings as may be required in light of this opinion; but in no case should damages be assessed for the period during which HUD completely neglected this case.

Affirmed in part, vacated in part, and remanded for further proceedings as outlined herein.