RENDERED: OCTOBER 1, 2021; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0447-MR

COMMONWEALTH OF KENTUCKY
COMMISSION ON HUMAN RIGHTS                                    APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v.          HONORABLE CHARLES L. CUNNINGHAM, JR., JUDGE
ACTION NO. 20-CI-000205

FINCASTLE HEIGHTS MUTUAL
OWNERSHIP CORP.                                                      APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, LAMBERT, AND McNEILL, JUDGES.

LAMBERT, JUDGE:  The Commonwealth of Kentucky, Kentucky Commission on Human Rights (the Commission) has appealed from the March 10, 2020, opinion and order of the Jefferson Circuit Court dismissing its complaint related to a housing discrimination claim made by a resident of the Fincastle Heights Mutual Ownership Corporation (Fincastle Heights).  We affirm.

Before we address the merits of this appeal, we believe it would be helpful to explain the role of the Commission in combatting discrimination, specifically related to housing:

> The Kentucky Commission on Human Rights ("Commission") is a state agency. It was created by the General Assembly in 1960. *See* [Kentucky Revised Statutes (KRS)] 344.150. The Commission consists of eleven members. *Id.* The members are appointed for three[-]year terms by the Governor. *Id.* The Governor also selects one of the eleven members to serve as the chairperson. *Id.* . . . The Commission's purpose is "to encourage fair treatment for, to foster mutual understanding and respect among and to discourage discrimination against any racial or ethnic group or its members." KRS 344.170. Among other powers, the Commission is vested with the authority to "to receive and investigate complaints relating to discrimination, to offer recommendations to eliminate any injustices it discovers, and to hold public hearings and request the attendance of witnesses." *Owen v. Univ. of Ky.*, 486 S.W.3d 266, 269 (Ky. 2016) (citing KRS 344.180 and KRS 344.190).
>
> KRS 344.600 governs complaints filed before the Commission alleging discriminatory housing practices. Such complaints must be filed with the Commission "not later than one (1) year after an alleged discriminatory housing practice has occurred or terminated[.]" KRS 344.600(1)(a)1. After a housing discrimination complaint has been filed, the Commission "shall within five (5) days serve written notice upon the aggrieved person acknowledging the filing and advising the aggrieved person of the time limits and choice of forums provided in KRS 344.635." KRS 344.600(1)(b)1. Within ten days of the complaint, the Commission must "serve on the respondent a written notice identifying the alleged discriminatory housing practice and advising the

respondent of the procedural rights and obligations of respondents under this chapter, together with a copy of the original complaint[.]" KRS 344.600(1)(b)2. The respondent has ten days after receiving the Commission's notification to file an answer. KRS 344.600(1)(b)3.

The Commission "shall commence an investigation of the alleged discriminatory housing practice within thirty (30) days of filing the complaint and complete the investigation within one hundred (100) days after the filing of the complaint, unless it is impracticable to do so." KRS 344.600(1)(b)4. "If the [C]ommission is unable to complete the investigation within one hundred (100) days after the filing of the complaint, the [C]ommission shall notify the complainant and respondent in writing of the reasons for not doing so." KRS 344.600(1)(c). Following its investigation, "[t]he [C]ommission shall determine, based on the facts, whether probable cause exists to believe that a discriminatory housing practice made unlawful under this chapter has occurred or is about to occur." KRS 344.625(1). The Commission "shall" make its probable cause determination "not later than the one hundredth day after the date a complaint is filed unless: (a) It is impracticable to make the determination; or (b) The [C]ommission has approved a conciliation agreement relating to the discriminatory housing complaint." KRS 344.625(2). "If it is impracticable to make the determination within the time period provided by subsection (2) of this section, the [C]ommission shall notify the complainant and respondent in writing of the reasons for the delay." KRS 344.625(3).

"If the [C]ommission determines that probable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, the commission shall, except as provided in subsection (6) of this section, immediately issue a charge on behalf of the aggrieved person for further proceeding under KRS 344.635." KRS 344.625(4). "If the [C]ommission

determines that no probable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, the [C]ommission shall promptly dismiss the complaint. The [C]ommission shall make public disclosure of each dismissal at the request of the respondent." KRS 344.625(7).

After the Commission issues a discriminatory housing charge, the Commission shall cause a copy thereof, together with information as to how to make an election of an administrative or judicial choice of forum under KRS 344.635, and the effect of such election, to be served on each respondent named in the charge, together with a written notice of opportunity for a hearing at a time and place specified in the notice, unless that election is made, and on each aggrieved person on whose behalf the discriminatory housing complaint was filed. *See* KRS 344.630. When a discriminatory housing charge is filed, a complainant, a respondent, or the aggrieved person on whose behalf the complaint is filed, may elect to have the claims asserted in that charge decided in a civil action under KRS 344.670, in lieu of an administrative hearing before the Commission under KRS 344.640. *See* KRS 344.635. This election must be made not later than twenty days after the receipt by the electing person of service under KRS 344.630, from the commission or, in the case of the Commission, not later than twenty days after service to the respondent and complainant. *Id*.

Assuming that no election is made to have the matter decided in a civil action, the Commission must provide an opportunity for an administrative hearing in accordance with KRS Chapter 13B with respect to the charge issued under KRS 344.625. *See* KRS 340.640. Following the administrative hearing, the Commission must determine whether the respondent engaged in discriminatory conduct. *See* KRS 344.645. Thereafter, "the [C]ommission shall issue a final order in accordance with the provisions of KRS Chapter 13B." *Id*. "If the

-4-

> [C]ommission finds that a respondent has engaged or is about to engage in a discriminatory housing practice, the [C]ommission shall promptly issue a final order for appropriate relief, which may include actual damages suffered by the aggrieved person and injunctive or other equitable relief." KRS 344.645. "If the [C]ommission finds that the respondent has not engaged or is not about to engage in a discriminatory housing practice, the [C]ommission shall enter a final order dismissing the charge." KRS 344.645(3).

*Teen Challenge of Kentucky, Inc. v. Kentucky Commission on Human Rights*, 577 S.W.3d 472, 475-77 (Ky. App. 2019) (footnotes omitted). With this backdrop in mind, we shall now turn to the case before us.

In August 2018, Cynthia Sarven applied to join Fincastle Heights, a mutual ownership corporation that is an association of 248 single-family residences in Louisville. The Fincastle Heights Board of Directors (the Board) accepted her application later that month, and Sarven signed a mutual ownership contract that included a no pet policy before she moved into a residence on Fincastle Road. Sarven claimed that prior to moving in to her residence, she informed Fincastle Heights that she would have an emotional support animal – a dog – in the home. In December of that year, Sarven provided a requested letter from her health care provider dated December 6, 2018, detailing Sarven's diagnosis of Differential Illness under the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and the help her emotional support animal would provide.

-5-

On January 24, 2019, Fincastle Heights, through counsel, sent Sarven a letter related to the no pet policy, indicating that it had become aware that she had a pet animal living in her residence. It formally notified Sarven that she needed to remove the pet from her residence in two weeks of her receipt of the letter. Her failure to do so would result in the Board taking all legal measures to terminate her membership in the organization and evict her from her residence. A staff attorney from the Legal Aid Society responded via email and attached the December 6 letter. The letter explained that the animal in Sarven's unit was not a pet but a service animal.

After a Board meeting, Fincastle Heights sent a follow up letter dated February 20, 2019, in which it indicated it needed more information before it could consider Sarven's request for an accommodation as her disability or handicap was not obvious. It therefore requested information regarding her diagnosis, the major life activities her condition affected, and how an emotional support animal would substantially impact her ability to cope with her symptoms. However, Fincastle Heights provided Sarven with a temporary accommodation to keep her dog in the residence until it made its decision.

In a letter dated March 1, 2019, the Lexington Fair Housing Council[1] made a formal request that Sarven be permitted to keep an emotional support animal in her home and included several attachments in support of this request. Fincastle Heights replied in a March 7, 2019, letter again asking for additional information as Sarven's disability was not obvious. In an April 25, 2019, response, the Lexington Fair Housing Council indicated that the requested verification had already been provided and that Fincastle Heights' continued refusal to grant an accommodation and demand additional information violated the law. The response included an undated letter from Sarven's provider that discussed her symptoms and how the emotional support animal would help her. Fincastle Heights responded in a letter dated April 27, 2019, stating that the Board would consider Sarven's request at its next meeting. It also questioned what jurisdiction that organization had based upon the complaint the Board had received from the Commission. Fincastle Heights sent a letter to Sarven the same day extending her temporary accommodation pending the Board's decision.

Meanwhile, on April 22, 2019, Sarven filed a complaint of housing discrimination with the Commission, stating that Fincastle Heights refused to grant

---

[1] "The Lexington Fair Housing Council . . . is a nonprofit civil rights agency that investigates complaints of housing discrimination throughout Kentucky. Individuals who believe they have been the victims of housing discrimination in Kentucky may contact the Council. The Council investigates the complaints. If the Council determines that the complaints are valid, it assists the individuals in filing complaints in court, with the Commission, and/or with the U.S. Department of Housing and Urban Development[.]" *Teen Challenge*, 577 S.W.3d at 475.

her an accommodation and demanded personal information that it was not entitled to receive. She claimed that Fincastle Heights had violated KRS 344.360, KRS 344.280, and the Fair Housing Act, 42 United States Code (U.S.C.) § 3601, *et seq.*, by discriminating against her based upon her disability. The Commission served Fincastle Heights with the complaint that day. The Commission indicated that the complaint had been assigned to an investigator and that it would not make a determination until the investigation was completed.

On May 15, 2019, Fincastle Heights sent a letter to Sarven indicating that it had voted to approve her request to keep an emotional support animal in her residence based upon the subsequent letter from her provider. The provided letter had further explained the symptoms of Sarven's diagnosis and how the emotional support animal would help her function.

By letter dated August 14, 2019, the Commission, through its enforcement officer, Cedric Irvin, Jr., informed Fincastle Heights that its investigation of Sarven's complaint had not been completed and that it needed additional time to complete it (the impracticability letter). On November 20, 2019, the Commission entered its determination of probable cause and charged Fincastle Heights with discriminating against Sarven by failing to accommodate her disability by forcing her to provide unnecessary documentation related to her need for an assistance animal. In doing so, the Commission charged that Fincastle

Heights had violated KRS 344.360 and 40 U.S.C. § 3604. Fincastle Heights elected to have the charge decided in a civil action rather than in an administrative hearing before the Commission.

On January 9, 2020, the Commission filed a complaint for declaratory judgment, damages, and injunctive relief against Fincastle Heights on behalf of Sarven that included two counts. First, it alleged a cause of action for discrimination for failure to accommodate pursuant to KRS 344.360(1), (2), (9), and (11)(b) for Fincastle Heights' refusal to make a reasonable accommodation to afford Sarven the opportunity to use and enjoy her unit. Second, it alleged discrimination in the terms, conditions, or privileges of rental pursuant to KRS 344.360(2), (10), and (11)(b) based upon Fincastle Heights' insistence that Sarven remove her emotional support animal from the property. The Commission sought an injunction preventing Fincastle Heights from discriminating against current or prospective tenants or buyers due to their disability as well as compensatory and punitive damages for Sarven.

Fincastle Heights made a special appearance and moved to dismiss the Commission's complaint pursuant to Kentucky Rules of Civil Procedure (CR) 12.02 for failure to state a claim upon which relief may be granted, citing three grounds for dismissal. First, Fincastle Heights contended that the Commission's complaint was not timely filed pursuant to KRS 344.625(2) as the probable cause

determination had not been made within 100 days of the filing of the initial complaint by Sarven on April 22, 2019. The impracticability letter sent by the Commission was dated August 14, 2019, which was 113 days after the filing of the initial complaint. Because neither the impracticability letter was sent nor the charge was made within 100 days, Fincastle Heights argued that the complaint was time-barred. Second, Fincastle Heights argued that it was not a real estate operator as defined by KRS 344.010(8) as alleged in the Commission's complaint because it did not own, manage, or control any residential real property either for lease or rent. Rather, it was a mutual cooperative. And third, Fincastle Heights argued that it had not discriminated against Sarven due to her disability as it had the legal right to request additional information as her claimed disability was not obvious. It had further allowed her an accommodation to keep her support animal throughout the process. The Commission disputed Fincastle Heights' assertion that the claim should be dismissed.

The court held a hearing on March 6, 2020, and the court entered an opinion and order on March 10, 2020, granting the motion to dismiss. While it did not rule on the argument that Fincastle Heights was not a real estate operator, the circuit court did hold that the Commission had violated the 100-day rule as the determination was not made until 212 days after the complaint was filed and the impracticability letter was sent outside of the 100-day window. It also held that,

because it took Fincastle Heights less time to investigate Sarven's request for an accommodation than it did for the Commission to investigate her complaint, Fincastle Heights had not discriminated against her.  This appeal now follows.

On appeal, the Commission argues that a violation of the 100-day rule set forth in KRS 344.625 does not act as a jurisdictional bar and that it had pled a legally cognizable cause of action in its complaint, meaning that dismissal pursuant to CR 12.02 was not proper.

CR 12.02 provides for the filing of a motion for a judgment on the pleadings:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:  (a) lack of jurisdiction over the subject matter, (b) lack of jurisdiction over the person, (c) improper venue, (d) insufficiency of process, (e) insufficiency of service of process, (f) failure to state a claim upon which relief can be granted, and (g) failure to join a party under Rule 19.  A motion making any of these defenses shall be made before pleading if a further pleading is permitted.  No defense or objection is waived by being joined with one or more defenses or objections in a responsive pleading or motion.  If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, he may assert at the trial any defense in law or fact to that claim for relief. If, on a motion asserting the defense that the pleading fails to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one

-11-

for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

In *Benningfield v. Pettit Environmental, Inc.*, 183 S.W.3d 567, 570 (Ky. App. 2005), this Court set forth our standard of review in an appeal seeking review of an order granting a motion to dismiss pursuant to CR 12.02 for failure to state a claim upon which relief may be granted:

> A motion to dismiss should only be granted if "it appears the pleading party would not be entitled to relief under any set of facts which could be proved in support of his claim." *Pari-Mutuel Clerks' Union v. Kentucky Jockey Club*, 551 S.W.2d 801, 803 (Ky. 1977). When ruling on the motion, the allegations in "the pleadings should be liberally construed in a light most favorable to the plaintiff and all allegations taken in the complaint to be true." *Gall v. Scroggy*, 725 S.W.2d 867, 868 (Ky. App. 1987). In making this decision, the trial court is not required to make any factual findings. *James v. Wilson*, 95 S.W.3d 875, 884 (Ky. App. 2002). Therefore, "the question is purely a matter of law." *Id*. Accordingly, the trial court's decision will be reviewed *de novo*. *Revenue Cabinet v. Hubbard*, 37 S.W.3d 717, 719 (Ky. 2000).

With this standard in mind, we shall review the Commission's arguments.

For its first argument, the Commission contends that the 100-day rule set forth in KRS 344.625(2) and (3) does not function as a procedural bar if it is violated. That statute addresses the Commission's duty and the associated procedure it must follow to make a probable cause determination once a

-12-

discriminatory housing practice complaint has been made. KRS 344.625 states, in

relevant part, as follows:

> (1) The commission shall determine, based on the facts, whether probable cause exists to believe that a discriminatory housing practice made unlawful under this chapter has occurred or is about to occur.
>
> (2) The commission shall make the determination under subsection (1) of this section not later than the one hundredth day after the date a complaint is filed unless:
>
>> (a) It is impracticable to make the determination; or
>>
>> (b) The commission has approved a conciliation agreement relating to the discriminatory housing complaint.
>
> (3) If it is impracticable to make the determination within the time period provided by subsection (2) of this section, the commission shall notify the complainant and respondent in writing of the reasons for the delay.

The federal Fair Housing Act contains the same 100-day requirement in 42 U.S.C.

§ 3610(a)(1)(B)(iv) and (C):

> (B) Upon the filing of such a complaint—
>
> . . . .
>
>> (iv) the Secretary shall make an investigation of the alleged discriminatory housing practice and complete such investigation within 100 days after the filing of the complaint (or, when the Secretary takes further action under subsection (f)(2) with respect to a complaint, within 100 days after the commencement of

-13-

such further action), unless it is impracticable to do so.

(C) If the Secretary is unable to complete the investigation within 100 days after the filing of the complaint (or, when the Secretary takes further action under subsection (f)(2) with respect to a complaint, within 100 days after the commencement of such further action), the Secretary shall notify the complainant and respondent in writing of the reasons for not doing so.

This language also appears in 42 U.S.C. § 3610(g)(1):

The Secretary shall, within 100 days after the filing of the complaint (or, when the Secretary takes further action under subsection (f)(2) with respect to a complaint, within 100 days after the commencement of such further action), determine based on the facts whether reasonable cause exists to believe that a discriminatory housing practice has occurred or is about to occur, unless it is impracticable to do so, or unless the Secretary has approved a conciliation agreement with respect to the complaint. If the Secretary is unable to make the determination within 100 days after the filing of the complaint (or, when the Secretary takes further action under subsection (f)(2) with respect to a complaint, within 100 days after the commencement of such further action), the Secretary shall notify the complainant and respondent in writing of the reasons for not doing so.

The gist of the Commission's argument is that federal courts have consistently held that the agency's failure to satisfy the 100-day rule does not deprive that agency of jurisdiction or mandate dismissal of the fair housing claim and that the statute does not require the impracticability letter to be sent at a specific time. This represents a question of statutory interpretation. In *Pearce v.*

-14-

*University of Louisville, by and through its Board of Trustees*, 448 S.W.3d 746 (Ky. 2014), the Supreme Court of Kentucky addressed the standard of review of statutory construction:

> Statutory construction is an issue of law that we review *de novo*.  Therefore, "[t]he trial court's and Court of Appeals's [sic] construction of statutes is also entitled to no deference on appeal . . . ."  *Cumberland Valley Contractors, Inc. v. Bell County Coal Corp.*, 238 S.W.3d 644, 647 (Ky. 2007) (citing *Bob Hook Chevrolet Isuzu, Inc. v. Kentucky Transportation Cabinet*, 983 S.W.2d 488, 490 (Ky. 1998)).
>
> In construing a statute, it is fundamental that our foremost objective is to determine the legislature's intent in enacting the legislation.  "To determine legislative intent, we look first to the language of the statute, giving the words their plain and ordinary meaning." *Richardson v. Louisville/Jefferson County Metro Government*, 260 S.W.3d 777, 779 (Ky. 2008).  Further, we construe a "statute only as written, and the intent of the Legislature must be deduced from the language it used, when it is plain and unambiguous . . . ." *Western Kentucky Coal Co. v. Nall & Bailey*, 228 Ky. 76, 14 S.W.2d 400, 401-02 (1929).  Therefore, when a statute is unambiguous, we need not consider extrinsic evidence of legislative intent and public policy. *County Bd. of Educ. Jefferson County v. Southern Pac. Co.*, 225 Ky. 621, 9 S.W.2d 984, 986 (1928).  However, if the statutory language is ambiguous, we will look to other sources to ascertain the legislature's meaning, such as legislative history and public policy considerations. *MPM Financial Group Inc. v. Morton*, 289 S.W.3d 193, 198 (Ky. 2009).  Further, we "read the statute as a whole, and with other parts of the law of the Commonwealth, to ensure that our interpretation is logical in context." *Lichtenstein v. Barbanel*, 322 S.W.3d 27, 35 (Ky. 2010).

*Pearce*, 448 S.W.3d at 749.

This Court's opinion in *Teen Challenge*, cited by Fincastle Heights, appears to be the only published case in Kentucky to mention the 100-day rule and the impracticability letter. In *Teen Challenge*, this Court recognized the Commission's mandatory duty to make a probable cause determination within 100 days, stating, "KRS 344.625 states in unequivocal terms that the Commission must issue a determination on probable cause within one hundred (100) days of the complaint having been filed unless the Commission explains why it is impracticable to do so within that time period." 577 S.W.3d at 481-82. In that case, the Commission had not provided an explanation of impracticability or the need for additional time to investigate the complaint, but instead it dismissed the complaint without prejudice more than a year after it had been filed without addressing probable cause. *Id*. at 482. The Court went on to state:

> We are sympathetic to the burdens placed on the Commission. The Commission is charged with investigating an enormous amount of complaints and making a determination in a relatively short amount of time. The statute, however, provides the Commission with a remedy. It can delay rendering a decision on probable cause beyond the one-hundred (100) day mark so long as it provides the parties with its reasons for needing additional time to complete an investigation.

*Id*. However, we agree with the Commission that the statutory responsibility addressed in *Teen Challenge* was the duty for the Commission to make a probable

-16-

cause determination; it did not address whether the 100-day rule acted as a jurisdictional bar.

Because there are no Kentucky cases directly on point and because the state statute mirrors the federal one, we shall consider federal law as guidance in our review:

> In Kentucky, "the cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature." *Beshear v. Haydon Bridge Co., Inc.*, 304 S.W.3d 682, 703 (Ky. 2010) (citation and brackets omitted). "The obvious place to start is with the language of the statute itself." *Members Choice Credit Union v. Home Fed. Savings and Loan Ass'n*, 323 S.W.3d 658, 660 (Ky. 2010). If the Kentucky Act is "similar to a Federal Act," its language "will normally be interpreted consistent with federal law." *Starr v. Louisville Graphite, Inc.*, No. 2014-CA-000620-MR, 2016 WL 1612940, *3 (Ky. Ct. App. Apr. 22, 2016); *see also Ammerman v. Bd. of Educ. of Nicholas Cty.*, 30 S.W.3d 793, 797-98 (Ky. 2000) (holding the Kentucky Civil Rights Act "should be interpreted consistently with" Title VII).

*Vance v. Amazon.com, Inc.*, 852 F.3d 601, 610 (6th Cir. 2017).

The Commission argues that federal courts have consistently held that the failure to satisfy the 100-day rule does not deprive the agency of jurisdiction or require dismissal of a fair housing claim. We have reviewed the cases cited by the Commission and agree.

In *United States v. Beethoven Associates Ltd. Partnership*, 843 F.

Supp. 1257 (N.D. Ill. 1994), a federal district court in Illinois considered the

jurisdictional nature of that portion of the federal statute and observed:

> There is nothing in the language of section 3610
> that can fairly be construed as imposing a jurisdictional
> limit. The Fair Housing Act provides that "Upon the
> filing of such a complaint . . . . The Secretary shall make
> an investigation of the alleged discriminatory housing
> practice and complete such investigation within 100 days
> after the filing of the complaint . . . unless it is
> impracticable to do so." 42 U.S.C. § 3610(a)(1)(B)(iv).
> The plain language of this section indicates that Congress
> anticipated situations in which the investigation could not
> be completed within 100 days, and qualified its mandate
> ("shall") with an exception ("unless").
>
> Congress' intent is further evidenced by the
> requirements of the original section 3610 (Pub.L. 90-
> 284), which was amended by the above-referenced
> section in 1988. The original section required the
> Secretary to investigate all claims within thirty days and
> provided no exceptions. Allowing 100 days indicates
> Congress' awareness of the need for a more flexible
> standard.
>
> Perhaps more telling than what the language of the
> statute does say is what it does not. There is no language
> indicating that the 100-day deadline was intended to be
> jurisdictional. Section 3610(a)(1)(A)(i) provides that
> "An aggrieved person may, not later than one year after
> an alleged discriminatory housing practice has occurred,
> file a complaint with the Secretary alleging such
> discriminatory housing practice." This statement is an
> express time limit on the ability of aggrieved persons to
> bring claims. It contains no qualifying language. The
> ultimate sanction, loss of the claim, is applied when the
> complaint is not filed within the time limit imposed by

the statute. No such sanction is mentioned as to [United States Department of Housing and Urban Development] HUD and its 100-day limit. To the contrary, the use of the qualifier, "unless" provides an obvious hedge to be used by the agency when necessary.

Finally, Congress chose not to define the term "impracticable" in amending section 3610. Instead, when the investigation cannot be completed within 100 days, the amended section requires only that "the Secretary shall notify the complainant and respondent in writing of the reasons for not doing so." 42 U.S.C. § 3610(a)(1)(C). The statute does not require HUD to prove that it is impracticable to complete its investigation within 100 days, but only requires it to notify the parties of the need to continue its investigation beyond the 100-day period. In addition, there is no language in the Act that imposes a sanction on HUD for failure to notify the parties when it requires more than 100 days to investigate a claim. Thus, the language of section 3610, as amended, indicates Congress' attempt to provide a more workable framework in which HUD can function in enforcing housing discrimination claims.

*Beethoven*, 843 F. Supp. at 1261-62.

The Sixth Circuit Court of Appeals has addressed this issue in two opinions, pointing out that prejudice must be demonstrated before a dismissal would be warranted:

Delay by HUD in investigation beyond 100 days does not constitute a violation of § 3610 nor the regulations thereunder, because subsection (C) permits the Secretary to set out its reasons for the delay. There is an implied "good cause" basis for extending the period for investigation beyond 100 days. The notice sent out included that the Secretary would conclude the investigation within 100 days unless "impracticable" to

-19-

do so. HUD notified Baumgardner on or about August 8, 1989, that its increased caseload would delay processing. Under these circumstances, because the extension beyond 100 days was not lengthy and little actual prejudice was demonstrated, we conclude that there is no basis for dismissal on this account.

*Baumgardner v. Secretary, U.S. Dep't of Housing and Urban Development*, 960 F.2d 572, 578 (6th Cir. 1992) (footnote omitted). And the next year it held:

Despite these findings of clear and unexplained violations of provisions of the Act intended to avoid delay and undue expense, the ALJ concluded that the Kellys did not suffer a due process violation. This determination was based primarily upon the fact that the petitioners could demonstrate no prejudice from the delays. It is true that the delays do not appear to have prejudiced the petitioners' ability to defend against the charge of a violation. Thus, we agree with the ALJ to the extent he concluded that his liability determination was not affected by the delays. The ALJ recognized, however, that the delay did increase Ms. Staples' claim for damages, and attempted to take this into account by declining to assess a civil penalty.

*Kelly v. Secretary, U.S. Dep't of Housing and Urban Development*, 3 F.3d 951, 956 (6th Cir. 1993). In both of these cases, the impracticability letter was sent after 100 days from the time the complaint was filed had elapsed.

Two years later, in *United States v. Tropic Seas, Inc.*, 887 F. Supp. 1347, 1363 (D. Haw. 1995), a federal district court in Hawaii observed:

[B]oth the language of the statute and what little case law exists on the matter suggest that the 100-day provision is non-jurisdictional. . . . In fact, most courts that have addressed the issue have held that HUD's failure to

-20-

> complete its investigation within the 100-day period will not require dismissal of a fair housing complaint absent a showing of substantial prejudice to the respondent.

The impracticability letter in this case was also sent after the expiration of the 100-day period.

Turning to the present case, we hold that the failure of the Commission to abide by the 100-day rule is not jurisdictional in nature and will not subject a claim to dismissal unless impracticability has not been proven and a showing of substantial prejudice has been made. In addition, the statutory language does not require the impracticability letter to be mailed prior to the expiration of the 100-day period. Here, Fincastle Heights has not argued that the Commission did not establish impracticability, that the need for additional time was unnecessary or unreasonable, or that any prejudice resulted; rather, it argues that the letter was not timely and that, therefore, jurisdiction was lacking. We disagree with Fincastle Heights' assertion and hold that the Commission complied with the statute by issuing the impracticability letter shortly after the 100-day period expired. Any holding of the circuit court to the contrary is error.

Next, the Commission argues that the circuit court erred in dismissing the complaint for the failure to set forth a legally cognizable cause of action, asserting that whether Fincastle Heights overreached in requesting documentation regarding Sarven's disability or took too long to grant her request for

accommodation were questions of fact for the jury to decide. Fincastle Heights

first argues that the Commission failed to adequately preserve this issue by listing

it as an issue in its prehearing statement. Our review of the prehearing statement

confirms that this issue was adequately preserved. However, we do agree with

Fincastle Heights that the Commission's complaint was properly dismissed as it

could not establish a cause of action for housing discrimination.

KRS 344.360 sets forth the cause of action for housing discrimination

and states in relevant part as follows:

> It is an unlawful housing practice for a real estate
> operator, or for a real estate broker, real estate salesman,
> or any person employed by or acting on behalf of any of
> these:
>
> (1) To refuse to sell, exchange, rent, or
> lease, or otherwise deny to or withhold, real
> property from any person because of race,
> color, religion, sex, familial status,
> disability, or national origin;
>
> (2) To discriminate against any person
> because of race, color, religion, sex, familial
> status, disability, or national origin in the
> terms, conditions, or privileges of the sale,
> exchange, rental, or lease of real property or
> in the furnishing of facilities or services in
> connection therewith;
>
> . . . .
>
> (9) To discriminate in the sale or rental, or to
> otherwise make unavailable or deny, a

housing accommodation to any buyer or renter because of a disability of:

(a) That buyer or renter;

(b) A person residing in or intending to reside in that housing accommodation after it is so sold, rented, or made available; or

(c) Any person associated with that buyer or renter; or

(10) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such housing accommodation, because of a disability of:

(a) That person; or

(b) A person residing in or intending to reside in that housing accommodation after it is sold, rented, or made available; or

(c) Any person associated with that person.

(11) For purposes of this section, discrimination includes:

. . . .

(b) A refusal to make reasonable accommodations in rules, policies, practices, or

services, when the
accommodations may be
necessary to afford the person
equal opportunity to use and
enjoy a housing
accommodation[.]

KRS 383.085 addresses assistance animals and defines such animals

in subsection (1)(a) as:

[A]n animal that works, provides assistance, or performs
tasks for the benefit of a person with a disability, or
provides emotional support that alleviates one or more
identified symptoms or effects of a person's disability.
This shall include a service animal specifically trained or
equipped to perform tasks for a person with a disability,
or an emotional support animal that provides support to
alleviate one or more identified symptoms or effects of a
person's disability[.]

That statute permits a person with a disability to request a reasonable

accommodation, and it also provides the person receiving the request with the

opportunity to seek additional information related to the request if the disability is

not readily apparent:

(2) A person with a disability may submit a request for a
reasonable accommodation to maintain an assistance
animal in a dwelling.  Unless the person's disability or
disability-related need is readily apparent, the person
receiving the request may ask the person making the
request to provide reliable documentation of the
disability-related need for an assistance animal, including
documentation from any person with whom the person
making the request has or has had a therapeutic
relationship.

(3) Unless the person making the request has a disability or disability-related need for an assistance animal that is readily apparent, a person receiving a request for a reasonable accommodation to maintain an assistance animal in a dwelling shall evaluate the request and any reliable supporting documentation to verify the disability-related need for the reasonable accommodation regarding an assistance animal. The person receiving the request may independently verify the authenticity of any supporting documentation.

A memorandum from HUD issued April 25, 2013, which was provided to Fincastle Heights by the Lexington Fair Housing Council, further explains:

Housing providers are to evaluate a request for a reasonable accommodation to possess an assistance animal in a dwelling using the general principles applicable to all reasonable accommodation requests. After receiving such a request, the housing provider must consider the following:

(1) Does the person seeking to use and live with the animal have a disability – i.e., a physical or mental impairment that substantially limits one or more major life activities?

(2) Does the person making the request have a disability-related need for an assistance animal? In other words, does the animal work, provide assistance, perform tasks or services for the benefit of a person with a disability, or provide emotional support that alleviates one or more of the identified symptoms or effects of a person's existing disability?

The memorandum goes on to state that "[h]ousing providers may ask individuals who have disabilities that are not readily apparent or known to the provider to

submit reliable documentation of a disability and their disability-related need for an assistance animal."

The record reflects, even in a light most favorable to the Commission, that Sarven's claimed disability was not readily apparent, that Fincastle Heights was therefore permitted to request additional documentation to support Sarven's request for an emotional support animal, that Fincastle Heights granted Sarven temporary accommodations that permitted her to keep her emotional support animal while the Board considered her request, and that Fincastle Heights ultimately granted Sarven's request, meaning that she was never without her emotional support animal. Having to provide additional documentation to support her request was not illegal or improper in the context of this case and cannot form the basis of a housing discrimination claim here. We also agree with the circuit court that any claim that Fincastle Heights' Board took too long to consider Sarven's request for an accommodation cannot stand in light of the lengthy time the Commission spent to consider her discrimination claim. Accordingly, we hold that the circuit court properly concluded that the Commission's complaint failed to state a claim upon which relief may be granted and dismissed the complaint.

For the foregoing reasons, the order of the Jefferson Circuit Court is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANT:   BRIEF FOR APPELLEE:

Colt C. Sells      Robert L. Heleringer
Louisville, Kentucky    Louisville, Kentucky